[Civ. No. 9152.   Third Dist.   Jan. 22, 1958.]

THE FLYING TIGER LINE, INC. (a Corporation), Appellant, v. STATE BOARD OF EQUALIZATION, Respondent.

(Two Cases.)

Keatinge & Older for Appellant.

Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, Ernest P. Goodman and Edward P. Hollingshead, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—Plaintiff and appellant, The Flying Tiger Line, Inc., hereinafter called appellant, began two suits against the State Board of Equalization, hereinafter called respondent, for the recovery of sales and use taxes, interest and penalties paid under protest. The actions were consolidated for trial and both are now before this court on appeal. In one action, in which appellant sought to recover $28,978.86, the court gave partial relief by awarding judgment in the sum of $2,870.63 and respondent has not appealed. Other than that, the trial court denied relief in both actions.

The litigation involves the taxability of a series of more or less independent transactions. We will first generally describe the various transactions involved.

Iberia Lineas Aereas Compania Mercantil Anonima of Madrid, Spain, hereinafter called Iberia, is a Spanish airline which does not operate within the United States. Prior to November 10, 1949, Iberia purchased two C-54 airplanes in the United States, and on that date entered into a written contract with appellant for the overhaul and repair of these aircraft at appellant's plant at Burbank in California. The aircraft were flown from without the state to Burbank and delivered to appellant for purposes of the contract. In the process of overhauling the aircraft, appellant transferred to Iberia title to $68,987.89 worth of materials, all of which became on installation an integral part of the aircraft. After the materials had been installed the planes were turned over to Spanish crews employed by Iberia and were flown out of the country. A sales tax is involved in this transaction.

In 1945 appellant purchased seven Budd aircraft from an agency of the federal government for the sum of $210,538.48. When purchased, the planes were located in Georgia. After purchase they were flown to Long Beach, California, and were

eventually put into service by appellant. Their cost was made the measure of a use tax.

During the years 1945 and 1946 appellant purchased 17 C-47 type aircraft and two C-54 type aircraft from an agency of the federal government. Five of the C-47's were purchased in California for the sum of $117,223. Ten of the C-47's and the two C-54's purchased outside of California were flown into the state. One C-47 purchased by appellant during the period here involved was disassembled in Oklahoma and parts therefrom were used in reconditioning the other C-47's which appellant brought into the state. Use taxes are involved in the controversy concerning the C-47's and the C-54's.

In August, 1950, appellant purchased two sets of ailerons for a price of $13,400 which were installed in planes which appellant had purchased from the federal government outside of this state. The aircraft had been damaged and the purchase of the ailerons was necessary to put them in condition to fly prior to the time they were brought into California. They were flown to Burbank. A use tax is involved in this transaction measured by the cost of the ailerons.

### THE IBERIA PLANES SALES TAX

We shall first consider appellant's contentions that the sales tax based on the sale to Iberia of material installed in the Iberia planes was invalid. After Iberia purchased the two C-54's the planes were flown to Burbank and delivered to appellant. The work of repair was performed and completed. Then Spanish crews, sent to Burbank for that purpose, flew the planes out of the country. Appellant contends: (a) that the sale of parts occurred outside of California, (b) that the imposition of the sales tax violated the import-export clause of the Constitution of the United States, and (c) that the sale was exempt under provisions of the Revenue and Taxation Code and under administrative rulings of the board.

In determining the issues involving the Iberia planes the court found as follows: That Iberia was not, at any time relevant in these actions, licensed or certificated by the Civil Aeronautics Administration or the Civil Aeronautics Board of the United States Government to operate within the United States; that $68,987.89 represents the sales price of material used by appellant in the overhaul and repair of the Iberia planes pursuant to the contract; that the planes repaired by appellant were purchased by Iberia in the United States and flown to appellant's base in California where the work of over-

haul and repair was performed; that the original contract provided for the delivery of the aircraft by appellant to Iberia at Las Vegas, Nevada, but that, subsequent to the execution of the written contract, the parties altered the contract by executed oral agreements in the following particulars: Iberia agreed to furnish Spanish crews to be sent to Burbank where they were to be instructed in the operation of the aircraft; that, after test flights, the aircraft were to be turned over to these Spanish crews which were to fly one of them to Havana, Cuba, and the other to Mexico City, Mexico; that at all times here in controversy the Spanish crews remained in the employ of Iberia and were never in the employ of or the agents of appellant; that the flights from Burbank out of the country were exclusively supervised and controlled by Iberia and that appellant neither retained the right nor had the right to direct the Spanish crews in the manner or method of operating or flying the aircraft out of the country; that delivery of the aircraft by appellant to Iberia occurred at Burbank, California; that prior to delivery of the aircraft, appellant installed the material and equipment and completed the repair work and the installation and repair work were accepted by Iberia prior to delivery to it of the aircraft; that title to the parts and equipment so installed passed to Iberia prior to the time the aircraft were turned over to the Spanish crews; that the sales of material and equipment were made and completed in California at the time the material and equipment were installed in the aircraft and accepted by Iberia; that the aircraft were not in transit during the period of repair; that upon installation the material and equipment became an integral part of the aircraft.

Much of appellant's attack upon the judgment of the trial court upholding the sales tax in regard to the Iberia planes is in reality an attack upon the findings of the court that the sale of the parts took place in California prior to the delivery of the planes to Iberia and prior to the flights which took the planes out of the country. We think these essential findings are supported both by a proper construction of the contract between the parties and by the evidence of the conduct of the parties under it. The wording of the contract itself indicates that the completion and acceptance of the work should take place before delivery of the aircraft out of the bailment for repairs. Paragraph Eighth of the contract reads as follows: "Delivery of Aircraft. After completion of the work and acceptance of the aircraft by Iberia, the Con-

tractor shall deliver said aircraft to Iberia or its representative at Las Vegas, Nevada.'' Paragraph Third provides: ''. . . The Contractor shall be paid the balance due it hereunder upon completion and acceptance of the aircraft by Iberia prior to or simultaneously with the delivery of the same to it.'' Paragraph Sixth provides: ''. . . After final inspection at the Contractor's plant, Burbank, California, Iberia, through its authorized agent, shall finally accept the work and take delivery of said aircraft.'' Paragraph Fourteenth of the contract designated two persons as Iberia's authorized representatives to, among other things, ''make inspections and to accept final delivery of the aircraft.'' By the contract, Iberia reserved the right to inspect the aircraft and the work being done from time to time, including inspection of materials and parts before use, and was to be afforded proper facilities therefor. It was given the right to have up to five inspectors at the Burbank plant to observe the progress of the work and to consult and advise with the contractor's representatives. Appellant agreed ''upon completion of work hereunder to supply Iberia with a Certificate of Airworthiness of the NC type and all other necessary documents as prescribed by the Civil Aeronautics Administration pertinent to engines, propellers and aircraft.'' Appellant was also ''to perform the necessary test flights of each such aircraft prior to acceptance thereof by Iberia'' and it was further provided that ''final inspection shall be accomplished by Iberia within five days after the Contractor notifies Iberia that the work has been completed.'' After the executed oral alteration of the contract, respecting the point of delivery, Spanish crews were sent to Burbank by Iberia. They arrived a considerable time before the planes left, during which time they were instructed in the operation of the aircraft and participated in some test flights to increase their familiarity with the planes. After this, they flew the planes out of Burbank and out of the country. From all of the foregoing, we think the court could, as it impliedly did, conclude that the intent of the parties was that the work of repair, including installation of the parts used in repair, should be completed and finally accepted prior to the delivery of the planes back to Iberia and that, therefore, the record supports the court's ultimate finding that the sale of the parts, that is, the passage of title to the parts, took place at Burbank prior to the taking possession of the aircraft by the Spanish crews for the purpose of flying the planes out

of the country. The sale of the parts, therefore, did take place in California.

Flying Tiger contends that the imposition of the sales tax violated the export-import clause of the Constitution of the United States. Reference should here be made to certain decisions of the courts which establish a guiding rule wherewith to determine when an article is in export and, therefore, exempt from taxation by the several states.

In *Coe* v. *Errol,* 116 U.S. 517 [6 S.Ct. 475, 29 L.Ed. 715], the court said at page 527:

". . . [N]o definite rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State. What we have already said, however, in relation to the products of a State intended for exportation to another State, will indicate the view which seems to us as the sound one on that subject, namely: that such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another State or have been started upon such transportation in a continuous route or journey."

In *Empresa Siderurgica, S.A.* v. *County of Merced,* 337 U.S. 154 [69 S.Ct. 995, 93 L.Ed. 1276], the court said at page 157:

". . . It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice.

"So in this case it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed. Part of the plant that is taxed was dismantled, but it had not been delivered to any carrier for export or otherwise started on its journey on the tax date. It might still have been diverted into the domestic market. The fact that any such diversion would entail a breach of contract, that a part of the plant had already started on its export journey, that an export license had been obtained and a letter of credit deposited in this country increases the expectation on the tax date that exportation of the entire plant would eventuate. But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed."

Here, the taxable event was the passage of title to the parts installed in the aircraft. The trial court properly found that this event occurred before the aircraft were delivered into the possession of the Spanish crews. At that moment, therefore, it cannot be said, under the decisions quoted from and others applying the same tests, that the planes were in export. Even the delivery of the planes into the hands of the Spanish crews prior to the out-of-country flight was not an entry of the planes and their component parts into the stream of export. Iberia could still have sold the craft to domestic owners within the country and thus have voluntarily interrupted the completion of its plans for export. Of course, the history of the events in connection with these aircraft shows a continuous and firm intent on the part of Iberia to take the aircraft out of the country and to its base of operations in Madrid where it would put them into commercial use. Nevertheless, the planes had not started on their journey and under the circumstances here controlling nothing less than the actual start of the journey, that is, the start of the export flight could be considered as meeting the tests applicable to determine when export had begun. All that was done up to the beginning of the export flights undoubtedly increased the expectation on the tax date that exportation would eventuate "But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed." We hold that the imposition of the sales tax did not violate the provisions of the import-export clause of the Constitution of the United States.

Appellant finally contends that the sale of parts to Iberia was a transaction exempt under the provisions of sections 6352 and 6387 of the Revenue and Taxation Code and ruling Number 55 of the Board of Equalization. Passing the reply of the board that section 6387 of the code was not enacted until 1955 and assuming the applicability of the cited legislation and ruling, the transaction does not come within their embrace. The specific exemption claimed is stated in section 6387 as follows:

"There are exempted from the computation of the amount of the sales tax the gross receipts from sales of tangible personal property purchased for use solely outside this State and delivered to a forwarding agent, export packer, or other person engaged in the business of preparing goods for export or arranging for their exportation, and actually delivered

to a port outside the continental limits of the United States prior to making any use thereof.''

Appellant argues that the delivery of the airplanes was made to Mr. Carlos Goetz as the forwarding agent of Iberia; that the parts were purchased for use outside California and were, in fact, delivered to ports outside the continental United States prior to making any use thereof. But one of the essential facts in issue is whether or not Mr. Goetz took delivery as forwarding agent of Iberia. Under the evidence it appears that he was designated by Iberia as its general agent; that as such he had power to accept performance of the contract and redelivery of the planes out of bailment. Although he was named in the shipper's export declarations as a forwarding agent for export control and custom purposes, that does not mean that when the delivery of the airplanes under the contract was made to him as general agent of Iberia that he was acting in the capacity of forwarding agent. The court found that the delivery was made to Iberia and the finding is supported.

We conclude that the tax upon the sale of parts to Iberia made during the reconditioning of its planes was valid, and we pass to the next transaction which has to do with the seven Budd aircraft.

### The Use Tax With Respect to the Seven Budd Aircraft

In 1945 appellant purchased seven Budd aircraft from an agency of the federal government for the sum of $210,538.48. After purchase, these aircraft were flown into California. At that time appellant was authorized to engage in interstate transportation and was likewise authorized to engage in intrastate transportation in California. It is the contention of appellant that before these planes were brought into the state pay loads were acquired for all of them for the flight into the state and they, therefore, were already engaged in interstate commerce and could not be taxed because the imposition of the use tax would violate the commerce clause of the Constitution of the United States. The argument is that the flying of pay loads into California on their first entrance into the state made the craft instrumentalities of interstate commerce so that the imposition by California of a use tax was an imposition of an excise tax on the instrumentalities of interstate commerce and violative of the federal Constitution. The trial court made the following findings

pertinent to the issue under discussion: The aircraft were received by appellant at Augusta, Georgia, and prior to the entry of these planes into California the individual planes were licensed by the Civil Aeronautics Administration. All of the aircraft were flown at all times under the authority of certificates or permits issued by the Civil Aeronautics Administration. All of the pilots operating all of the aforesaid equipment were at all times licensed by the Civil Aeronautics Administration. The Budd aircraft were flown into California for the purpose of delivering said aircraft to their home base in Long Beach, California. These aircraft did not carry pay loads on their initial flights into California. The Budd aircraft had no destination after they were delivered to their home base in California, and were stored at this home base for an indefinite period of time before they were put into commercial service.

Appellant challenges the court's findings that the planes carried no pay loads into California on their first entry into the state. On that issue the evidence was sharply conflicting. There was testimony from which the court could have found that pay loads were carried by all of the planes, but the witnesses giving such testimony were impeached by extrajudicial statements made by them to the contrary. Mr. Prescott, appellant's president, stated that he had supplied information for an article written and published setting forth the history of appellant's operations and appearing in the American Magazine in January, 1946, wherein he stated that he flew the first of the Budd aircraft into California and carried only his wife's car as cargo; that thereafter that aircraft made its first commercial flight by transporting grapes from California to the East coast. There was also published by appellant in June of 1951 an article in which one of the pilots who flew the Budd aircraft in 1945 was quoted as saying: "When the first plane came out of final MX [final inspection and maintenance] I loaded my car aboard and headed for Long Beach, which was to be our home base. On August 1st we got our first pay load from Long Beach to the East Coast . . . " There was other evidence from which the court could conclude as it did, that the planes had not entered interstate commerce as instrumentalities thereof until after their arrival in California. It is unnecessary to relate that evidence in detail. From the record we conclude that the court's finding as here challenged is supported.

The use tax is imposed pursuant to section 6201 of the

Revenue and Taxation Code, which, so far as here relevant, provides:

"An excise tax is hereby imposed on the storage, use, or other consumption in this State of tangible personal property purchased from any retailer on or after July 1, 1935, for storage, use, or other consumption in this State at the rate of 3 percent of the sales price of the property, . . ."

Section 6008 defines "storage" as "any keeping or retention in this State for any purpose except sale in the regular course of business or subsequent use solely outside this State of tangible personal property purchased from a retailer."

Section 6009 defines "use" as "the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of that property in the regular course of business."

It appears from the findings of the trial court that these planes were brought into California and arrived at the home base of appellant; that there then intervened an indefinite period of time before the planes were put to commercial use. The court found that during this time these planes were stored and also that they were used in that during that period appellant exercised rights and powers over the aircraft incident to the ownership thereof. The court concludes that the period of indeterminate extent between the arrival of the planes at the appellant's home base in California and their commercial use constituted a taxable period and that the imposition of the use tax during that period did not violate the commerce clause of the Constitution of the United States.

Respondent relies on the cases of *Southern Pac. Co.* v. *Gallagher*, 306 U.S. 167 [59 S.Ct. 389, 83 L.Ed. 586], and *Pacific Tel. & Tel. Co.* v. *Gallagher*, 306 U.S. 182 [59 S.Ct. 396, 83 L.Ed. 595]. Both the Southern Pacific Company and Pacific Telephone and Telegraph Company were engaged in interstate commerce. In the Southern Pacific case, a foreign corporation engaged in the railroad business in California and other states was required to pay the California use tax with respect to tangible personal property purchased outside of the state for immediate installation in an interstate railway facility. Items purchased included rails, equipment, machinery, tools, and office supplies. In the case of large-scale construction the material was fabricated for a particular use in connection with the transportation facilities and shipped to its California destination and installed upon arrival. The

court pointed out in *Southern Pac. Co.* v. *Gallagher*, at pages 173 and 176:

". . . To avoid delay and cost the movement from loading to final placement is as nearly continuous as managerial efficiency can contrive. . . . All purchases may be said to be dedicated to consumption in the interstate transportation business of appellant. . . . [U]se and storage as defined in the California act are taxable intrastate events, separate and apart from interstate commerce . . .''

Referring to articles which were installed immediately on arrival at the California destination, the court said at pages 177 and 179:

". . . If articles so handled are deemed to have reached the end of their interstate transit upon 'use or storage' no further inquiry is necessary as to the rest of the articles which are subjected to a retention, by comparison, farther removed from interstate commerce. We think there was a taxable moment when the former had reached the end of their interstate transportation and had not begun to be consumed in interstate operation. At that moment the tax on storage and use—retention and exercise of a right of ownership, respectively—was effective. The interstate movement was complete. The interstate consumption had not begun . . . 'Practical continuity' does not always make an act a part of interstate commerce. . . . Here, under our analysis, we find only intrastate events taxed.''

In *Pacific Tel. & Tel. Co.* v. *Gallagher, supra,* there was involved equipment forming an integral part of taxpayers' interstate telephone and telegraph business. The court found that the equipment was shipped to the telephone company at the place of use where it was unloaded by employees of the company. In most instances, the trucks delivering the equipment were driven directly to the building where the equipment was to be installed. There was no holding of the equipment in warehouses. The court, in concluding that such equipment was taxable, said:

"The appellant exercises two rights of ownership in California—retention and installation—after the termination of the interstate shipment and before the use or consumption on its mixed interstate and intrastate telephone system. We see no material distinction between the contentions of the appellant and those disposed of in *Southern P. Co.* v. *Gallagher, ante,* 586 [167].''

Under the authority of the foregoing decisions we hold that in the instant case, in relation to the Budd aircraft,

there was a taxable moment intermediate the time the aircraft arrived at their home base in California and the time of their first commercial use. The planes were held at the home base for a period of time before that first commercial use. Although the evidence does not disclose how long this period of detention and use was, yet as indicated in the cases we referred to no particular length of time is required to constitute a taxable moment. (See also *Atchison, etc. Ry. Co.* v. *State Board of Equalization,* 139 Cal.App.2d 411 [294 P.2d 181].) The trial court's refusal to adjudge return of the tax paid upon the seven Budd aircraft must be affirmed.

### The Use Tax Upon the Sixteen C-47 Type Aircraft and Two C-54 Type Aircraft

Appellant purchased 17 C-47 type aircraft and two C-54 type aircraft during 1945 and 1946 from an agency of the federal government. Ten of the C-47 type aircraft and the two C-54 type aircraft were purchased outside of California and were flown to their home base in California without revenue loads by employees of appellant after having been put into operating condition and having been certified as to "Airworthiness by the United States Civil Aeronautics Administration." Five of the C-47 type aircraft were purchased in California by appellant, and appellant obtained possession of these aircraft in this state. One of the remaining C-47 type aircraft was disassembled outside of California and its parts were used to repair the C-47's that were flown into this state. The trial court upheld the imposition of the use tax with respect to all these aircraft.

The trial court found that the remaining C-47 type aircraft was never brought into California and rendered judgment in favor of appellant for the recovery of the use tax imposed thereon. The taxability of this latter aircraft is not involved herein.

The court made the following findings: Appellant, at the time it acquired these aircraft, was also engaged in interstate commerce. Ten of the C-47 type aircraft and two of the C-54 type aircraft were purchased outside of California and flown into this state without revenue loads by employees of appellant for the purpose of delivering said aircraft to their home base. The home base of appellant was in the Los Angeles area of California. The aircraft had no destination after they were delivered to their home base in California, and were stored and used at this home base for an indefinite

period of time before their first commercial use. The five aircraft referred to in subparagraph 7 of paragraph Eighth of the contract (reference is to the five C-47 type aircraft which were located in California at the time they were purchased from an agency of the federal government) were reconditioned in California to the extent necessary to satisfy the requirements of the Civil Aeronautics Authority. An authorization for their commercial use was obtained from that agency in this state. These aircraft were stored and used at appellant's home base in California for an indefinite period of time prior to their first commercial use. These findings are supported by the record.

The legal issues relative to the taxability of the C-47's and the C-54's purchased outside of this state are essentially the same as those arising with respect to the Budd aircraft. The trial court was, therefore, warranted in finding that there was a taxable moment occurring in California before use of the aircraft for commercial purposes and that, therefore, they were subject to the imposition of the use tax. (*Southern Pac. Co.* v. *Gallagher, supra*; *Pacific Tel. & Tel. Co.* v. *Gallagher, supra.*)

■ Turning now to the five C-47's which were located in California when purchased, it appears that these planes were reconditioned after purchase to the extent necessary to meet the requirements for commercial use. How long the planes were thus stored and used before they were put into commercial use does not appear. The court was warranted in finding that there was such a period even though indefinite. These aircraft, although purchased in California, were subject to the use tax rather than the sales tax because they were purchased from an agency of the federal government which does not pay sales tax to this state. The use tax applies to property purchased for use in this state wherever purchased, unless the gross receipts from the sale have been included in the measure of the California sales tax (Rev. & Tax. Code, § 6401), or unless the transaction is otherwise exempted by the statute or by the state or federal Constitution. The findings of the court concerning storage and use of these aircraft after acquisition and before the planes were put to commercial use justifies the imposition of the tax. What has already been said concerning the Budd aircraft sufficiently answers appellant's contentions with regard to the effect of the commerce clause.

■ Turning now to the aircraft which was dismantled in Oklahoma, it appears, as the court found, that parts of this

aircraft were installed in other C-47 aircraft which were then brought into the state. The court found that the aircraft which was dismantled had been purchased from an agency of the federal government for the sum of $10,000; that its parts were incorporated into the other C-47's which were brought into the state and that the value of such other aircraft was thereby increased. The court further found that appellant had failed to establish what, if any portion, of said aircraft (the dismantled aircraft) was not brought into this state and the plaintiff had not attempted to establish the value of the portion of said aircraft, if any, which was not brought into this state; that parts of the said aircraft which were brought into this state as part of the C-47 aircraft referred to above were delivered to appellant's base in California and were stored and used in this state in the same manner as the aircraft referred to in subparagraphs 4 through 6 inclusive of paragraph Eighth of these findings (reference is to the aircraft brought into this state after parts of the dismantled craft had been installed therein). The use tax was applicable to this aircraft that was dismantled to the same extent as it was applicable to the planes of which it became a part. A tax was assessed on these planes as measured by their purchase price. An additional tax therefore was properly made in consideration of the increase in the measure of the tax by the integration into the planes of parts of the dismantled plane. Although it does not appear from the findings that all of the dismantled aircraft was brought into California as parts of the other aircraft, nevertheless the appellant offered no evidence as to what portions were not brought into the state or as to any value thereof and therefore failed to carry its burden of proof as to any proper reduction of the tax. (*People* v. *Schwartz*, 31 Cal.2d 59 [187 P.2d 12].)

THE AILERONS PURCHASED WITHOUT THE STATE INTEGRATED INTO AIRCRAFT AND FLOWN INTO THIS STATE

In August, 1950, appellant purchased two sets of ailerons at a cost of $13,400 for installation in planes which it had purchased from the federal government outside of California. These aircraft, when purchased, were damaged and the installation of the ailerons as a part of the operational controls was required in order to fly the aircraft into California. After the ailerons were installed, the planes were "ferried" to Burbank, California, by employees of the appellant. They did not carry a revenue load when they came into this state. Thereafter they

were used in appellant's operations, including the hauling of cargo from the West coast to the East coast. The court made these findings: Appellant installed said ailerons in Pyote, Texas, on aircraft purchased by it from an agency of the federal government. Said ailerons became part of the primary controls for said aircraft. The aircraft on which the ailerons were installed were then delivered to their home base in California without pay loads. After an indefinite period of storage in California, these aircraft were put into commercial service which included flights in interstate commerce.

Appellant contends that this transaction was exempt under the provisions of section 6366 of the Revenue and Taxation Code which, in pertinent part, provides: "There are exempted from the taxes imposed by this part the gross receipts from the sale of and the storage, use, or other consumption of aircraft sold to persons using such aircraft as certificated . . . carriers . . . in interstate . . . commerce under authority of the laws of the United States. . . ." Appellant says that since it obtained a certificate of public convenience and necessity, effective August 12, 1949, it was clearly a "certificated" carrier under the authority of the laws of the United States within the meaning of section 6366 of the Revenue and Taxation Code at the time the ailerons were purchased and brought into California as integral parts of the two C-47 aircraft during the course of appellant's interstate operations and, accordingly, says appellant, the transaction was exempt under the provisions of section 6366.

Although respondent board argues that the ailerons were not exempt under code section 6366, we consider that we ought to follow, as stating the law here applicable, the decision in the case of *Pan American World Airways, Inc.* v. *State Board of Equalization,* 131 Cal.App.2d 638 [281 P.2d 23]. We are unable to distinguish the facts in connection with this aileron transaction here involved from the facts in that case. There, equipment had been purchased by Pan American World Airways, Inc., for installation by the manufacturer in certain planes being built by that manufacturer upon order. When the planes were completed, they were flown into California and a use tax was imposed upon the installed equipment. We quote from the headnote: "Customer-furnished equipment which has been installed in and has become integral part of 'aircraft' prior to its arrival in this state is exempt from use taxes under Rev. & Tax. Code, § 6366." A petition for a hearing by the Supreme Court was denied. We deem this

court bound by that decision. Accordingly, the imposition of the use tax on the ailerons is invalidated.

The judgment in Action No. 86154 is affirmed. The judgment in Action No. 93474 is affirmed except as to that part which validates the use tax levied in the aileron transaction. The trial court is instructed to increase said last-mentioned judgment by the appropriate amount. Neither party shall recover costs.

Schottky, J., and Warne, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.