[Civ. No. 26775. Second Dist., Div. One. May 15, 1963.]

AMERICAN AIRLINES, INC., Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

Overton, Lyman & Prince, Carl J. Schuck, Debevoise, Plimpton, Lyons & Gates and Marvin Lyons for Plaintiff and Appellant.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, and Neal J. Gobar, Deputy Attorney General, for Defendant and Respondent.

FOURT, J.—This is an appeal from a judgment adjudging that plaintiff is not entitled to a refund of use taxes paid to the state in the amount of $181,385.61.

The taxes involved are for a five-year period from July 1, 1952, to June 30, 1957, and were assessed by respondent under the California Sales and Use Tax Law and paid under protest by appellant.

The facts were stipulated in a lengthy written stipulation submitted to the trial court. Generally the facts as stipulated were as follows: Appellant, (sometimes hereinafter referred to as "American" or as the "company") a Delaware corporation, is a certified air carrier and operated a major air transportation system carrying persons, property and mail throughout various parts of the United States and several foreign countries. The company is subject to regulations issued by the Civil Aeronautics Board and the Civil Aeronautics Authority in accordance with the law. The company's system is divided into four territorial regions for operational administration purposes. The western region covers stations in Arizona and California. The maintenance base for the entire system is at Tulsa, Oklahoma. At this base the company receives and tests all new engines and propellers and does the overhauling, including major repairing and testing of all engines and propellers which have been in use. The function of overhauling and testing radio equipment is performed for the entire system at La Guardia Airport in New York. The position of the company with respect to overhauled radio equipment and the parts used in such work is the same as its position with respect to overhauled engines and propellers and the parts used in such operations and consequently no further mention will be made of the radio equipment operations.

The aircraft of the company must be kept airworthy at all times to the end that flight schedules, contractual commitments and safety rules are met. To comply with such demands, the company must have for each aircraft in its system four components, including engines, propellers and radio equipment and parts for such components which can be installed in such aircraft at any given time. The company keeps on hand at its Tulsa and New York bases and at its regional bases, including Los Angeles, supplies in varying amounts of new and overhauled engines, propellers, and other equipment ready for installation as replacements for units which require overhaul or repair. In the event the supply of engines, propellers or other items is insufficient for the immediate needs of a regional base, the replacements are shipped into that base from the Tulsa base or from some other station of the system. During the period involved with which we are concerned, 18 new DC 7 engines and certain new propellers held at different times as standby replacement

units at the Los Angeles base were installed as replacements in aircraft at Los Angeles and other California stations. The use taxes assessed with respect to these units are in question. All of the new engines and propellers were purchased by the company and delivered to it at the maintenance base at Tulsa. The engines and propellers were purchased for system-wide use, including use in California, and were to be directed from Tulsa as and when they should be needed to carry on the business of the company. After the units arrived at Tulsa they were tested. In the case of engines, the testing lasted about eight hours, spread over a period of several days. In the case of propellers the testing lasted four hours.

After a period of storage in Tulsa lasting from 21 days to 292 days and averaging 132 days, the engines and propellers were shipped by truck or air to Los Angeles for installation in aircraft. After a period of storage and retention, 18 of the engines and certain propellers were installed at the California stations. The time of storage and retention in California prior to installation varied from about one day to 62 days. The elapsed time between departure from Tulsa and installation in California varied from one to 67 days. Upon completion of the installation of an engine functional checks were made and visual inspection was had. The propellers were checked to ascertain if they properly responded to certain pitching and feathering. Upon the completion of the checking, the aircraft on which the installation was made resumed scheduled flights by departing from a California point.

At the time of the purchase of the new engines and the propellers here involved and at the time of the shipment thereof to Los Angeles the company had not determined at what particular or specific station any particular or specific engine or propeller would be installed.

All of the overhauled engines and propellers involved in this case were either DC 6 or DC 7 equipment. When an engine or propeller was removed from an aircraft because of length of service or malfunctioning it was delivered to the base at Tulsa for repair or overhaul. The operation consisted of restoring such items in accordance with the regulations pertaining thereto.

The company stored at Tulsa all of the necessary parts for the overhaul and repair of engines or propellers. The parts

were purchased outside of California and were delivered to the company at Tulsa. The parts were kept on hand an average of about six months before they were installed in an engine in the course of an overhaul or repair.

The overhauled or repaired engines were tested at Tulsa to determine their airworthiness. The tests lasted about the same time as the tests on new engines.

During the period with which we are concerned 488 repaired and overhauled engines and certain repaired propellers were shipped from Tulsa to Los Angeles by truck or air and after a period of storage and retention in California they were installed in aircraft either in Los Angeles or at other stations in California. The time of storage and retention in California prior to installation varied from 3 to 77 days.

The use taxes here in issue with respect to the overhauled engines and propellers were assessed on the purchase price of the parts installed in the units. The aggregate purchase price of the parts installed in the repair of propellers on which the use tax is assessed was $174,510, and the aggregate purchase price of the parts installed in the overhaul of the engines on which the use tax is assessed was $3,739,153.

All of the repaired and overhauled engines and propellers after installation in aircraft were subjected to the same tests and checks as was the case with new engines and propellers.

At the time the parts were purchased to be used at Tulsa the company had not selected the particular engine or propeller in which the parts would be installed in the course of repair or overhaul, nor had it determined at what particular station any particular repaired item would be installed in an airplane. The parts had been purchased for use whenever and wherever (including California) such items would be needed. The company engaged in scheduled flights into and out of California. Passengers were carried between points within California. All of the company's flights originating in California terminate in other states.

During the time in question the scheduled miles flown in California by the company varied from 5.70 per cent to 6.04 per cent of its total miles flown, or in other words about 94 per cent of the use of the equipment was outside of California.

The trial court found that the parts which were installed in the new engines and propellers at Tulsa and the new engines and propellers were purchased for storage and use in

California and that such property was stored and used in California and that such personal property had come to rest in California prior to its installation into aircraft in California within the meaning of the statutes and further that the tax did not violate the commerce clause of the United States Constitution or section 6352 of the Revenue and Taxation Code.

The appellant now makes three major assertions. First, it states that the taxes here are outside the purpose of the use tax. Second, that the engines, propellers and parts were not purchased for storage, use or other consumption in California, claiming among other things the initial uses of the engines and propellers were substantial uses outside of California, that after installation in California the engines and propellers including the overhauled engines containing the taxed part were used more than 94 per cent outside of California, that under the respondent's administrative rulings property is not purchased for storage, use or consumption in California where there is prior substantial use outside of California and subsequent use more outside than inside of California, such property is not taxable. Third, that the taxes in issue are in violation of the commerce clause of the federal Constitution and of section 6352 of the Revenue and Taxation Code because the use of the engines and propellers in California was a use in interstate commerce and that the tax imposes an unconstitutional burden on interstate commerce.

Sections 6008, 6009, 6201, 6202, 6246 and 6352 of the Revenue and Taxation Code are set forth in a footnote.[1]

American urges that a narrow or restricted view be taken of the use tax, arguing in effect that the only purpose of the tax is to complement the sales tax. The facts of life are that sales and use taxes appeal to the legislatures of the various

---

[1]§ 6008. "['Storage.'] 'Storage' includes any keeping or retention in this State for any purpose except sale in the regular course of business or subsequent use solely outside this State of tangible personal property purchased from a retailer."

§ 6009. "['Use.'] 'Use' includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of that property in the regular course of business."

§ 6201. "[Imposition and rate of tax.] An excise tax is hereby imposed on the storage, use, or other consumption in this State of tangible personal property purchased from any retailer on or after July 1, 1935, for storage, use, or other consumption in this State at the rate of 3 percent of the sales price of the property, and at the

states (34 of which impose sales and use taxes), California and Oklahoma included, as an expedient and ready source of revenue. The use tax is a constitutional way of compelling interstate business or commerce to pay a fair share of the cost of providing the benefits of state governmental protection and services rendered to interstate business activities within the state.

The use tax is based in part upon the philosophy that it is unfair to compel companies engaged solely in intrastate business to pay taxes where companies engaged in interstate activities within the state do not. Or, as Justice Traynor stated in 24 California Law Review 175, after stating the problem with reference to the commerce clause, "The solution is in no sense to grant special privileges to local business, *but to remove those special privileges from interstate commerce.*" (Italics added.) The use tax, if properly imposed, as it was in this case, "does not discriminate against interstate commerce, or constitute a prohibited regulation or interference therewith." See *Chicago Bridge & Iron Co.* v. *Johnson,* 19 Cal.2d 162, 175 [119 P.2d 945]. See also *Atchison, etc. Ry. Co.* v. *State Board of Equalization,* 139 Cal.App.2d 411, 415 [294 P.2d 181], with reference to the intent of the Legislature

rate of 2½ percent on and after July 1, 1943, and to and including June 30, 1949, and at the rate of 3 percent thereafter."

§ 6202. "[Persons liable for tax: Extinguishment of liability.] Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax. His liability is not extinguished until the tax has been paid to this State except that a receipt from a retailer *engaged in* business in this State or from a retailer who is authorized by the board, under such rules and regulations as it may prescribe, to collect the tax and who is, for the purposes of this part relating to the use tax, regarded as a retailer *engaged in* business in this State, given to the purchaser pursuant to Section 6203, is sufficient to relieve the purchaser from further liability for the tax to which the receipt refers." (Italics added.)

§ 6246. "[Presumption as to property shipped or brought to state.] It shall be further presumed that tangible personal property shipped or brought to this State by the purchaser was purchased from a retailer on or after July 1, 1935, for storage, use, or other consumption in this State."

§ 6352. "[Goods protected by constitutional or statutory prohibition.] There are exempted from the taxes imposed by this part the gross receipts from the sale of and the storage, use, or other consumption in this State of tangible personal property the gross receipts from the sale of which, or the storage, use, or other consumption of which, this State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this State."

in adopting section 6246 of the Revenue and Taxation Code and wherein it was stated as follows:

"The general purpose, nature and constitutionality of this tax have long been determined and need not be discussed. (*Douglas Aircraft Co., Inc.* v. *Johnson,* 13 Cal.2d 545 [90 P.2d 572]; *Anders* v. *State Board of Equalization,* 82 Cal. App.2d 88 [185 P.2d 883]; *Brandtjen & Kluge, Inc.* v. *Fincher,* 44 Cal.App.2d Supp. 939 [111 P.2d 979].)''

██ The sales and use taxes are mutually exclusive. (*Douglas Aircraft Co., Inc.* v. *Johnson,* 13 Cal.2d 545, 549 [90 P.2d 572].) The United States Supreme Court in *Southern Pac. Co.* v. *Gallagher,* 306 U.S. 167, 171 [59 S.Ct. 389, 83 L.Ed. 586, 590] said:

"As property covered by the sales tax is exempt under the use tax, all tangible personalty sold or utilized in California is taxed once for the support of the state government. Definitions in the Use Tax Act of taxpayer, retailer, storage and use are designed to make the coverage complete. A retailer is 'every person, engaged in the business of making sales for storage, use or other consumption;' use is the exercise of any right or power incident to ownership, except sale in the regular course of business; storage is any 'keeping or retention' with a similar exemption; and a taxpayer includes everyone 'storing, using or otherwise consuming' the property subject to the use tax.''

██ In *General Trading Co.* v. *State Tax Commission,* 332 U.S. 335, 349 [64 S.Ct. 1028, 88 L.Ed. 1309, 1319], the court in speaking of an Iowa use tax said: "Of course, no State can tax the privilege of doing interstate business. . . That is within the protection of the Commerce Clause and subject to the power of Congress. On the other hand, the mere fact that property is used for interstate commerce or has come into an owner's possession as a result of interstate commerce does not diminish the protection which he may draw from a State to the upkeep of which he may be asked to bear his fair share. But a fair share precludes legislation obviously hostile or practically discriminatory toward interstate commerce. . . .

"*. . . . . . . . . . .*

"None of these infirmities affects the tax in this case any more than it did in the other cases with which it forms a group. The tax is what it professes to be—a non-discriminatory excise laid on all personal property consumed in Iowa.

The property is enjoyed by an Iowa resident partly because the opportunity is given by Iowa to enjoy property no matter whence acquired. The exaction is made against the ultimate consumer—the Iowa resident who is paying taxes to sustain his own state government. To make the distributor the tax collector for the State is a familiar and sanctioned device."

A recent statement in *Bank of America* v. *State Board of Equalization*, 209 Cal.App.2d 780, 791 - 793 [26 Cal.Rptr. 348] (hearing denied) is as follows: "One of the chief purposes of the use tax is to help retailers in this state, who are subject to sales tax, to compete on an equal footing with their out of state competitors who are exempt from the sales tax. Thus it is intended to reach property purchased for use and storage in this state from retailers who, being outside of the territorial boundaries of California, are not subject to its laws at all. It also seeks to reach such property where the taxable event of a sales tax, i.e., the sale, occurs outside of this state or where such property is immune from the sales tax because of the commerce clause. (*Southern Pac. Co.* v. *Gallagher*, 306 U.S. 167 [59 S.Ct. 389, 83 L.Ed. 586]; *Douglas Aircraft Co. Inc.* v. *Johnson*, 13 Cal. 2d 545 [90 P.2d 572]; *Chicago Bridge & Iron Co.* v. *Johnson*, 19 Cal.2d 162 [119 P.2d 945]; *People* v. *West Publishing Co.*, 25 Cal.2d 80 [216 P.2d 441]; *Atchison etc. Ry. Co.* v. *State Board of Equalization*, 139 Cal.App.2d 411 [294 P. 2d 181]; *Brandtjen & Kluge* v. *Fincher*, 44 Cal.App.2d Supp. 939, 942 [111 P.2d 979]; 3 Witkin, Summary of Cal. Law, § 137, p. 2250.) The use tax is complemental to the sales tax, and as such is intended to supplement the latter by imposing upon those subject to it a tax burden equivalent to the sales tax in order that tangible personal property sold or utilized in this state would be taxable once for the support of the state govenment. (*Southern Pac. Co.* v. *Gallagher, supra,* 306 U.S. 167; *Chicago Bridge & Iron Co.,* v. *Johnson, supra,* 19 Cal.2d 162; Traynor, *The Cal. Use Tax* (1936) 24 Cal.L.Rev. 175, 176-177.) The tax is limited to the ' " *use* . . . of property *purchased for use*" ' within the state. (Traynor, *supra,* p. 176; *Atchison etc. Ry. Co.* v. *State Board of Equalization, supra,* 139 Cal.App.2d 411, 422.) It is not intended to apply to property subject to the sales tax. (Traynor, *supra,* p. 176.) This does not mean, however, that all property which is subject to the sales tax is

exempt from the use tax, 'but, rather, that all property *not actually covered* by the sales tax is subject to the use tax.' (*In re Los Angeles Lumber Products Co.*, 45 F.Supp. 77, 86.)

As said in *Flying Tiger Line* v. *State Board of Equalization*, 157 Cal.App.2d 85 [320 P.2d 552]: 'The use tax applies to property purchased for use in this state *wherever* purchased, unless the gross receipts from the sale have been included in the mesure of the California sales tax (Rev. & Tax. Code, § 6401), or unless the transaction is otherwise exempted by the statute or by the state or federal Constitution.' (P. 98; emphasis added.)

" . . . . . . . . . . . .

"It should be pointed out, moreover, that while the California sales tax and use tax are complemental to each other, they are not interdependent. Each is a separate tax. The sales tax is imposed upon the retailer for the privilege of selling tangible personal property (§ 6051), while the use tax, as we have pointed out above, is upon the purchaser who stores, uses or consumes property in this state. A perusal of the legislative history of the two acts discloses that at the time the use tax was enacted (in 1935), local sales had already been subjected to sales tax (since 1933). It is conceivable that the sales tax might be abolished completely, thus requiring only the buyers to pay a use tax for the use, storage, or other consumption of the article purchased irrespective of its origin. (See *In re Los Angeles Lumber Products Co., supra*, 45 F.Supp. 77, 86.) . . ."

The argument that a limited and narrow construction should be placed upon the use tax was made in *Douglas Aircraft Co., Inc.* v. *Johnson*, 13 Cal.2d 545 [90 P.2d 572]. The court there held that the use tax is an excise tax for revenue, levied on the use, storage or consumption of the property in question. It is said at page 551 therein as follows:

"In the second place it is obvious, from a reading of the act, that the tax here levied is not imposed on the ownership of property as such. It does not apply to the use of property to be resold. It does not recur annually, but falls due only once. It is not imposed on a fixed day, although it is collectible quarterly—in short, it does not fall upon the owner because he is the owner, regardless of the use or disposition he may make of the property. It is imposed on certain of the privileges of ownership, but not on all of them."

American asserts that the items in question were not

purchased for storage, use or other consumption in California. The argument seems to run to the effect that since the items were purchased outside of the state and were stored outside the state, tested outside the state and in the case of parts, incorporated into other items of personal property outside of the state, that therefore none of the items was purchased for use in California. In short, American asserts that since the items were consumed in interstate commerce primarily outside the state, the use tax of California does not apply.

Respondent's position is that at the time of purchase of the items, American contemplated their storage and installation in California; that they were purchased for the purpose of incorporation and installation into aircraft in California to the end that such aircraft would become operational in California. The storage was preliminary to the ultimate functional use of the items and under the statutory definitions and the interpretations put thereon all of the items were purchased for storage and use in California.

In *Chicago Bridge & Iron Co.* v. *Johnson,* 19 Cal.2d 162, [119 P.2d 945], where the court dealt with the situation where plaintiff purchased materials out of the state for fabricating tanks out of the state specifically to fill orders in California, the contracts called for the erection of the tanks by plaintiff on the customer's premises in California. After the tanks were built outside of California they were shipped to California "knocked down," and then reconstructed in California at the customer's site. The court held that retention of the "knocked down" tanks in California pending installation constituted storage and use of the component parts, saying among other things:

"It cannot be doubted that those materials which were purchased by plaintiff to fabricate tanks specifically to fulfill contracts or orders for tanks in California, were purchased for use, storage or other consumption in this state. Those materials were designed for the purpose of being used by plaintiff to erect tanks on its customer's premises in California in compliance with its contractual obligation. To say that in ascertaining whether the tax applies, one may not look through the fabrication or manufacture to the purchase of materials used in that process and conclude that such purchase was for storage or use in California, is to sacrifice substance for form. The true reason and purpose for purchasing the materials was not merely the fabrication thereof into

tanks. Plaintiff did not intend to stop there. It purchased those materials for use and did use them in this state.'' (P. 168.)

Furthermore it appeared in the *Bridge* case that a portion of the materials was not purchased by plaintiff for specific contracts but as a part of its inventory out of state to be used in the construction of its tanks as its business might require, including orders from California if any. The court said with reference thereto at pages 168-169:

''In regard to the portion of materials purchased by plaintiff and retained as stock in its plants outside this state to be used in the construction of tanks as its business might require, it is clear that in order that the object and purpose of the Use Tax Act may not be frustrated, it must be concluded that they were subject to the use tax. Those materials were purchased for use, storage or other consumption in this state. While it is true that they were not acquired with the express purpose of performing any specified contract or order, plaintiff was engaged in the business of selling and constructing tanks in California. In the course of its business those materials might be used in California or elsewhere. It cannot be said therefore that they were not purchased for use here. They were purchased for use in California if and when the business required their use here to fill an order. The requirement arose and they were used in this state. It follows that those particular materials were purchased for use in California. The materials being used here following the intent to use them here upon a certain contingency, it objectively follows that they were acquired for use here.''

There can be no doubt that American purchased the items with which we are concerned for a purpose which contemplated that American would exercise right and power over the items as an incident of ownership, namely among other things that the items would be stored and installed in this state. The functional purpose of the items was to make the aircraft operational and the property was purchased and brought into this state for such purpose and committed in California to such purpose.

 American further contends that following the installation of the items into aircraft the property was thereafter substantially consumed in interstate commerce outside of this state. That may be and probably is true but it makes little difference in this case. We are not particularly con-

cerned with the ultimate consumption of the property but rather with whether American contemplated storage and installation in California at the time of purchase of the items and whether there was storage and installation in California. Had the Legislature intended that substantial use outside of the state after installation would suffice to exempt the property from the tax it would have said so. It did not. Section 6009.1 of the Revenue and Taxation Code provides in effect that storage and use do not include the keeping of any property which is to be used "solely outside the State." (See *Edelman* v. *Boeing Air Transport*, 289 U.S. 249 [53 S.Ct. 591, 11 L.Ed. 1155]; *Atchison, etc. Ry. Co.* v. *State Board of Equalization*, 139 Cal.App.2d 411 [294 P.2d 181]; *Flying Tiger Line* v. *State Board of Equalization*, 157 Cal.App.2d 85, 96, 97-98 [320 P.2d 552].)

The assertion to the effect that the respondent's own administrative rulings prohibit the collection of the tax is without merit. First of all there is nothing in the record before this court with reference to respondent's administrative practice. It would seem however that for a great number of years respondent has consistently held to the view that if the property was purchased for use in California and there was a "taxable moment" in California, the use tax was applicable. Furthermore, it appears that respondent repeatedly has ruled that if tangible personal property was committed to its functional or basic use in this state by way of installation or otherwise, it was subject to the use tax, even though the taxpayers may have exercised some power out of state after its purchase out of state, including testing or integrating into other personal property. Furthermore, under no circumstances could the respondent change by regulation the enactment of the Legislature which calls for a collection of the tax.

American's last contention is that the taxes here in issue are in violation of the commerce clause of the United States Constitution and of section 6352, Revenue and Taxation Code. We think the same contention has been answered many times by the Supreme Court of the United States and the Supreme Court of this state. There is the claim of multiple taxation and at the same time there is nothing in the record before this court which shows or even indicates that a use tax has been imposed by any other state. Under the circumstances of this case no use tax was possible after

the storage and installation in an instrumentality of interstate commerce or storage and reentry into interstate commerce in California, for the reason that the personal property was consumed in interstate commerce. At the very moment when the tax was applied however in California the personal property had come to rest in this state and was not being put to use in interstate commerce. The tax in question is due but once. It was appropriately stated in *Southern Pac. Co.* v. *Gallagher*, 306 U.S. 167, 172 [59 S.Ct. 389, 83 L.Ed. 586], after the court had considered the problem of multiple taxation and had pointed out that no such problem arose by the evidence, that it would be time enough to resolve the argument "when a taxpayer being in the state of origin is compelled to pay again in the state of destination." Our research has not produced any case where the Supreme Court has had before it a case where more than one state had actually imposed sales or use taxes on the same transaction. See 32 California Law Review 281, an article entitled, *The General Sales and Use Taxes and the Commerce Clause.* See also 75 Harvard Law Review 953, *Federal Limitations on State Taxation of Interstate Business,* (*Multiple Taxation* at p. 1017—*Sales and Compensating Use Taxes* at pp. 994 to 999).

The fact that American is engaged extensively or exclusively in interstate commerce, that the property in question is dedicated to interstate commerce and is ultimately consumed in interstate commerce, that the property here involved is in California for a comparatively short period of time and that the property was in part in interstate commerce before its storage, retention and installation in California and was consumed in interstate commerce after its storing, retention and installation in California is of little consequence under the particular circumstances of this case. The arguments and the disposition made in the *Southern Pacific Co.* and *Pacific Telephone* [*Pacific Tel. & Tel. Co.* v. *Gallagher*, 306 U.S. 182 (59 S.Ct. 396, 83 L.Ed. 595)] cases in the Supreme Court of the United States determine in large part the outcome of this case.

With reference to the assertion that the tax is a burden on interstate commerce the court in *Southern Pac. Co.* v. *Gallagher*, 306 U.S. 167 [59 S.Ct. 389, 83 L.Ed. 586], said at page 177:

"[W]e think there was a taxable moment when the former had reached the end of their interstate transportation and

had not begun to be consumed in interstate operation. At that moment, the tax on storage and use—retention and exercise of a right of ownership, respectively—was effective. The interstate movement was complete. The interstate consumption had not begun. *Champlain Realty Co.* v. *Brattleboro* [260 U.S. 366 (43 S.Ct. 146, 67 L.Ed. 309, 25 A.L.R. 1195)], and *Carson Petroleum Co.* v. *Vial* [279 U.S. 95 (49 S.Ct. 292, 73 L.Ed. 626)], are therefore inapplicable. *Bacon* v. *Illinois* [227 U.S. 504 (33 S.Ct. 299, 57 L.Ed. 615)], where taxation of grain during stoppage in transit was validated, presents a closed analogy. 'Practical continuity' does not always make an act a part of interstate commerce. This conclusion does not give preponderance to the language of the state act over its effect on commerce. State taxes upon national commerce or its incidents do not depend for their validity upon a choice of words but upon the choice of the thing taxed. It is true, the increased cost to the interstate operator from a tax on installation is the same as from a tax on consumption or operation. This is not significant. The prohibited burden upon commerce between the states is created by state interference with that commerce, a matter distinct from the expense of doing business. A discrimination against it, or a tax on its operation as such, is an interference. A tax on property or upon a taxable event in the state, apart from operation, does not interfere. This is a practical adjustment of the right of the state to revenue from the instrumentalities of commerce and the obligation of the state to leave the regulation of interstate and foreign commerce to the Congress.''

█ See also 46 Virginia Law Review 1051 to 1326, *A Symposium on State Taxation of Interstate Commerce* and particularly the section on *State Taxation of Interstate Sales* at pages 1290 to 1326 where it is pointed out that there "is no interference with interstate commerce unless the tax places interstate commerce at a disadvantage in comparison with local commerce. No such showing was or apparently could be made in this case.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied June 5, 1963, and appellant's petition for a hearing by the Supreme Court was denied July 10, 1963. Schauer, J., was of the opinion that the petition should be granted.