[Civ. No. 30708.    Second Dist., Div. Three.    Sept. 10, 1968.]

WESTERN CONTRACTING CORPORATION, Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

Thomas C. Lynch, Attorney General, Neal J. Gobar and Mario A. Roberti, Deputy Attorneys General, for Defendant and Appellant.

Johnson, Robertson, O'Sullivan & Ladenberger, Don A. Ladenberger, Kindig, Beebe, McCluhan & Rawlings and Lowell C. Kindig for Plaintiff and Respondent.

MOSS, J.—The State Board of Equalization appeals from that portion of the judgment by which Western Contracting Corporation ("Western") was adjudged entitled to a refund of use tax in the amount of $36,267.81. The tax was assessed and paid on the use in California by Western of the dredge "Western Eagle" which was built by Western at its facility in Kansas City, Missouri. The use tax was measured by the cost to Western of the component parts and materials used in the construction of the dredge.

The sole question before us is whether those parts and materials were "purchased . . . for storage, use, or other consumption in this State" within the meaning of that phrase as used in section 6201 of the Revenue and Taxation Code.[1]

The evidence material to this appeal was presented in a stipulation of facts and by the testimony of three witnesses

[1]Section 6201 of the Revenue and Taxation Code provides, "An excise tax is hereby imposed on the storage, use, or other consumption in this State of tangible personal property purchased from any retailer . . . for storage, use, or other consumption in this State. . . ."
All statutory references are to the Revenue and Taxation Code.

called by Western. The essential facts are not in conflict. Western is an Iowa corporation with its principal place of business at Sioux City, Iowa, and a repair and manufacturing facility at Kansas City, Missouri. Western is engaged in the heavy construction business throughout the United States and in many parts of the world. It is qualified to do business in all fifty states. It has been qualified to do business in California since 1949. Western first began dredging operations in 1955 and by the spring of 1958 owned four dredges. Western decided to construct the "Western Eagle" in the latter part of 1957. At that time three large dredging projects in the eastern part of the United States had been programmed by the Corps of Engineers and Western decided to build a fifth dredge in order to be in a position to bid on those projects. However, Western constructed the "Western Eagle" for use anywhere in the world where the business of Western might require its use. Western obtained plans for constructing the "Western Eagle" in the fall of 1957 and through the winter of 1957-1958 and started constructing the dredge in the spring of 1958 at its manufacturing facility in Kansas City. Construction of the dredge was completed on December 23, 1958. A portion of the materials used to manufacture the "Western Eagle" was purchased by Western specifically for that purpose and a portion of the materials used came from Western's general inventory. Inventory items were purchased by Western prior to commencement of construction of the "Western Eagle" for use as either spare parts for existing dredges or for construction of new equipment as the need might arise. All of the materials used in the construction of the "Western Eagle" were purchased by Western outside the State of California and became part of the finished dredge in Kansas City, Missouri.

On June 12, 1958, the City of San Diego issued a notice inviting bids for dredging work in Mission Bay, San Diego. Western was the successful bidder and on September 4, 1958, executed a contract with the City of San Diego. At the time it submitted its bid, Western contemplated using one of its other dredges, either the "Western Scout" or the "Western Hunter," on the Mission Bay project because it knew their operating costs. Both of these dredges were located in the Missouri River at the time. Western tentatively decided to use the "Western Eagle" for the Mission Bay project in the fall of 1958 while the dredge was still under construction. The record does not disclose the dates of purchase of the parts and ma-

terials bought specifically for the "Western Eagle" or the dates on which they were used in the construction of the dredge. After completion of the "Western Eagle" in Kansas City on December 23, 1958, it was moved by dredging to St. Louis, Missouri, where it arrived on February 14, 1959. Movement by dredging was necessary to insure passage down the river because of ice and the low water level of the river. The final decision to use the "Western Eagle" on the San Diego project was made when it arrived at St. Louis. A firm decision had not been made before that time because Western was not sure when construction of the "Western Eagle" would be completed, and since the trip from Kansas City to St. Louis was made after the navigation season Western was not sure when, if at all, the dredge would reach navigable water. The dredge finally arrived in San Diego on April 30, 1959. The trip cost $150,000 to $175,000. Prior to its arrival there it was not used for the performance of any dredging contracts.

On December 10, 1958, as part of a financing arrangement, Western engaged in a sale and lease-back transaction with an equipment dealer in Omaha, Nebraska, whereby the "Western Eagle" was sold to the lessor for $1,000,000 and leased back to Western which was given an option to purchase the dredge. The option to purchase was exercised and title returned to Western. Actual possession and use of the dredge at all times remained in Western. The lease agreement provided that after arrival in San Diego the dredge would not be removed from San Diego County without the lessor's prior written consent.

Between 1949 and 1951 Western maintained project offices in California in connection with canal work, and a district office in downtown Los Angeles. From 1951 until the award of the San Diego contract Western maintained no place of business in California.

Western completed the Mission Bay project on July 31, 1961. The "Western Eagle" remained at San Diego until it was employed in dredging work at San Pedro, California, under a contract with the Harbor Department of the City of Los Angeles. That contract was completed on May 27, 1963. The dredge remained idle at San Pedro, California, until July 3, 1963, when it was towed to Johnston Island in the Pacific Ocean for work on a dredging contract there. From the time the "Western Eagle" arrived in California Western bid unsuccessfully on twelve other jobs in California, as well as some jobs outside of California, for which it contemplated

using the "Western Eagle." The normal life of a dredge such as the "Western Eagle" is between 35 and 50 years.

Western contends that since it was not engaged in business in California at the time it commenced construction of the "Western Eagle" and did not decide unconditionally to use that dredge to perform the San Diego contract until after construction of the dredge was completed in Missouri, the parts and materials used in that construction were not purchased for use in California.

In its most recent expression of the governing rule the California Supreme Court said, "[P]roducts are purchased for use in California if at the time of sale, the [purchaser] contemplated that the products would be used in this state. (*Chicago Bridge & Iron Co.* v. *Johnson* (1941) 19 Cal.2d 162 [119 P.2d 945].) While that use may have been only a matter of the anticipated probabilities at the time of the purchase, once the probabilities congeal into particular events constituting a 'use' within the state, the transaction becomes taxable. (*Atchison, etc. Ry. Co.* v. *State Board of Equalization* (1956) 139 Cal.App.2d 411 [294 P.2d 181]; *Flying Tiger Line, Inc.* v. *State Board of Equalization* (1958) 157 Cal.App.2d 85 [320 P.2d 552].)" (*Union Oil Co.* v. *State Board of Equalization* (1963) 60 Cal.2d 441, 454 [34 Cal.Rptr. 872, 386 P.2d 496].)

*Chicago Bridge & Iron Co.* v. *Johnson,* 19 Cal.2d 162 [119 P.2d 945], is close to this case on its facts. There the taxpayer, an Illinois corporation, was a manufacturer of tanks. It purchased raw materials outside of California and manufactured them into completed tanks also outside of California. Some of the materials purchased by the taxpayer outside this state were placed in its inventory to be used as its business might require but were not intended for use in the performance of any particular contract. Materials from the inventory were used in the manufacture of tanks erected in California. The Supreme Court upheld the imposition of a use tax on these materials measured by the cost thereof to the taxpayer stating, "In regard to the portion of materials purchased by plaintiff and retained as stock in its plants outside this state to be used in the construction of tanks as its business might require, it is clear that in order that the object and purpose of the Use Tax Act may not be frustrated, it must be concluded that they were subject to the use tax. Those materials were purchased for use, storage or other consumption in this state. While it is true that they were not acquired with the express purpose of performing any specified contract or order, plaintiff was

engaged in the business of selling and constructing tanks in California. In the course of its business those materials might be used in California or elsewhere. It cannot be said therefore that they were not purchased for use here. They were purchased for use in California if and when the business required their use here to fill an order. The requirement arose and they were used in this state. It follows that those particular materials were purchased for use in California. The materials being used here following the intent to use them here upon a certain contingency, it objectively follows that they were acquired for use here.'' (19 Cal.2d at 168-169.)

A similar result was reached in *American Airlines, Inc.* v. *State Board of Equalization,* 216 Cal.App.2d 180 [30 Cal. Rptr. 590], where the court upheld the imposition of a use tax on repair parts which were purchased outside of California and stored in Tulsa, Oklahoma, where they were installed in engines and propellers in the course of overhaul and repair. The overhauled engines and propellers were shipped to California where they were installed in aircraft after storage and retention in California for periods of three days to 77 days. At the time the parts were purchased to be used at Tulsa the company had not selected the particular engine or propeller in which the parts would be installed in the course of repair or overhaul, nor had it determined at what partciular station any particular repaired item would be installed in an airplane. The court upheld the imposition of the use tax on these spare parts because the parts were purchased for a purpose which contemplated use in California.

The operative facts in *Chicago Bridge, American Airlines,* and this case are the same in the following respects: In each case the taxpayer purchased and stored outside of California parts and materials which it intended to use anywhere that its business might require, including possibly California; the parts and materials were not purchased with the intention of performing any specified contract or function in California; they were incorporated into a finished product outside of California and then shipped to California for use in the taxpayer's business here; the first use for which the finished product was constructed occurred in California. There is one distinction between the operative facts of this case and those in *Chicago Bridge* and *American Airlines*: In those cases each taxpayer was engaged in business in California at the time it purchased the parts and materials in question; in this case the taxpayer had no business in Cali-

fornia at the time some[2] of the materials later incorporated into the "Western Eagle" were purchased. From this distinction Western argues that the "anticipated probabilities" that the parts might be used in California were less in this case than they were in *Chicago Bridge* and *American Airlines*. We do not deem the factual distinction between the cases to be controlling because we need not weigh "the anticipated probabilities at the time of the purchase" once those probabilities are realized in use in California under circumstances that do not indicate an intention at the time of purchase to use the property in another state. The "Western Eagle" was not used to perform any contract outside of California before it was brought here. This case is thus distinguished from those cases relied upon by Western in which the property sought to be taxed had been used to perform contracts in other states before being brought to the taxing state (Iowa). (*Morrison-Knudsen Co.* v. *State Tax Com.* (1950) 242 Iowa 33 [44 N.W.2d 449, 41 A.L.R.2d 523] ; *Western Contracting Corp.* v. *Iowa State Tax Com.* (1961) 253 Iowa 365 [112 N.W.2d 326].)

There can be no question that the use of the parts and materials in the process of manufacture in Missouri was not a separate use out-of-state which would belie an intention to use those materials in California. (See *Chicago Bridge & Iron Co.* v. *Johnson, supra,* 19 Cal.2d 162, 167.) Neither is it significant that the "Western Eagle" was used in California for only 4½ years of its 35-year life. ■ "The use tax does not depend upon the *duration* of the use in California but upon the *fact* of *any* substantial use in California." (*Union Oil Co.* v. *State Board of Equalization, supra,* 60 Cal.2d 441, 450-451.)

■ The fact that Western did not finally decide until February 14, 1959, to use the "Western Eagle" at San Diego is not controlling. The lesson of the California use tax cases is that parts and materials are purchased for use in California if at the time of purchase it is contemplated that they might be used in California or elsewhere as the needs of the purchaser

[2]The parts and materials taken from inventory were purchased prior to commencement of construction of the "Western Eagle" in the spring of 1958. The record does not disclose when the other parts and materials were purchased, but since they were purchased specifically for construction of the "Western Eagle," some of them at least must have been purchased after the spring of 1958. By the same reasoning some of them may have been purchased after the execution of the San Diego contract by Western on September 4, 1958. In view of our holding, the exact dates of purchase become immaterial.

might require. ██ The use tax law contains a presumption that property brought to this state by the purchaser was purchased for use in this state. (Rev. & Tax. Code, § 6246.) That presumption is overcome where the purchaser demonstrates that the property was purchased with an intention to use it elsewhere. (*Morrison-Knudsen Co.* v. *State Tax Com., supra,* (1950) 242 Iowa 33 [44 N.W.2d 449, 41 A.L.R.2d 523]; *Western Contracting Corp.* v. *Iowa State Tax Com., supra* (1961) 253 Iowa 365 [112 N.W.2d 326].) However, the presumption is not overcome by a showing that the purchaser had no intention to use that specific property in California, where it is otherwise shown by reason of the nature of the purchaser's business that the property might be used in California. (*Chicago Bridge & Iron Co.* v. *Johnson, supra,* 19 Cal.2d 162; *American Airlines, Inc.* v. *State Board of Equalization, supra,* 216 Cal.App.2d 180; *Atchison etc. Ry. Co.* v. *State Board of Equalization, supra,* 139 Cal.App.2d 411.) Were the rule otherwise a company that operates in many states could avoid the payment of use tax in any state by demonstrating that it had not decided in which state to use the purchased products at the time of the purchase. When the parts and materials used in the manufacture of the "Western Eagle" were purchased, Western contemplated that they might be used in California or elsewhere. It cannot be said therefore that they were not purchased for use here.

██ Western argues that since oral and documentary evidence was offered in addition to the stipulation of facts that this court is bound by the findings of the trial court. However, this additional evidence did not create a conflict, but only supplemented the stipulation of facts. "Since the issues here involve the applicability of taxing statutes to uncontradicted facts, we are confronted purely with a question of law and are not bound by the findings of the trial court." [Footnotes omitted.] (*Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 381 [47 Cal.Rptr. 848]; *Standard Register Co.* v. *Franchise Tax Board,* 259 Cal.App.2d 125, 130 [66 Cal.Rptr. 803].)

The judgment is reversed.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied October 4, 1968, and respondent's petition for a hearing by the Supreme Court was denied November 7, 1968. Mosk, J., did not participate therein.