**Bob BULLOCK, Comptroller of Public Accounts, et al., Appellants,**

v.

**LONE STAR GAS COMPANY, a Division of Enserch Corporation, Appellee.**

**No. 5770.**

Court of Civil Appeals of Texas, Waco.

Nov. 17, 1977.

Rehearing Denied Dec. 8, 1977.

John L. Hill, Atty. Gen., Martha E. Smiley, Asst. Atty. Gen., Austin, for appellants.

Michael L. Cook, Clark, Thomas, Winters & Shapiro, Austin, for appellee.

## OPINION

JAMES, Justice.

This is a suit for refund of taxes under the Limited Sales Excise and Use Tax Act. The taxes were paid under protest by Plaintiff-Appellee Lone Star Gas Company pursuant to Article 20.10(G) and (H), Taxation-General, Volume 20A, Vernon's Texas Civil Statutes. Thereafter, Lone Star brought this suit in a District Court of Travis County, Texas, for refund of such taxes against Defendant-Appellants Bob Bullock, Comptroller of Public Accounts, Jesse James, State Treasurer, John L. Hill, Attorney-General of Texas, and the State of Texas.

Trial was had to the court without a jury, after which the trial court awarded judgment in favor of Lone Star against the Defendants for said taxes paid by Lone Star in the amount of $809,102.52 plus interest, from which the Defendants appeal. We affirm.

No findings of fact and/or conclusions of law were requested of or made by the trial court.

Defendant-Appellants assert error on the part of the trial court in holding: (1) that for sales tax purposes the sale of pipe took place outside the State of Texas; (2) that the use tax was unlawfully imposed on the storage of pipe after it arrived in the State of Texas and before it was assembled and used as a carrier; and (3) that Lone Star as a permit carrier was a "licensed and certificated carrier" and therefore exempted from the use tax by Article 20.04(G)(3)(a), Taxation-General, Vol. 20A, V.T.C.S. We overrule all of Defendant-Appellants' contentions and affirm the trial court's judgment. Our view of the case is bottomed upon two premises, to wit: (1) that the sale of the pipe in question took place in Europe and not within the State of Texas, to the end that the pipe was not subject to the sales tax; and (2) that Lone Star at the times material to this lawsuit was a "licensed and certificated carrier" within the meaning of Article 20.04(G)(3)(a), Taxation-General, Vol. 20A, V.T.C.S., so that the pipe was exempted from the use tax.

The pertinent facts are these: Lone Star is a Texas Corporation, having its principal place of business in Dallas, Texas, and is engaged in the business of gathering, transporting, and selling natural gas. Pursuant to its business, Lone Star holds permit Number 00578 from the Railroad Commission of the State of Texas. In the early part of 1972, Lone Star determined to construct an intrastate pipeline from the Delaware Basin in Pecos County, Texas, to Dallas County, Texas, which pipeline is designated "Line X," and is a 36 inch diameter pipeline about 442 miles long. The pipe weighs 141 pounds per foot. Lone Star purchased from domestic producers enough pipe for about the first 200 miles of Line X to be constructed, and this pipe is not in controversy here.

The pipe in controversy is that which was purchased by Lone Star to construct the remaining 242 miles of the pipeline, which was bought by Lone Star from the Crispin Corporation under a written contract.

Crispin is a Texas Corporation with its principal place of business in Houston, Texas. Its major business activity is brokering foreign steel products. Crispin's normal business procedure is to locate a buyer, then through its overseas contacts to arrange production of the buyer's order. It does not maintain an inventory of steel products, particularly of the size pipe in question, nor does it purchase such large pipe for its own account. Its assets consist of familiarity of European steel producers, their languages, production methods and schedules, and shipping resources.

The contract between Lone Star and Crispin was signed in July 1972. Pursuant to the contract, Crispin caused the pipe to be manufactured by firms located in France and Italy, bought the pipe from these foreign mills, and sold it to Lone Star for a profit. This pipe had to be specially constructed in order to meet the unique needs of Lone Star for Line X; therefore, by the contract Lone Star provided to Crispin a complete list of specifications, including the chemical properties of the steel from which the pipe was to be produced, the type of steel furnace in which the iron was to be made, inspection of the method for rolling the steel into flat plates prior to manufacture of the pipe, inspection of the flat plates, specification of the method of rolling the flat plates into finished pipe, the weld method for joining the flat plate into the finished pipe, the various physical properties of the pipe, procedures for loading the pipe on rail cars in Europe, procedures for storing the pipe in ships for shipment to the United States, and procedures for shipment of the pipe to the final destination point. Production was a three stage process: (1) the steel was produced, (2) the flat plate was rolled from the steel, and (3) the pipe

was manufactured from the flat plate. Steel mills throughout Europe were used in the manufacturing process. The pipe was manufactured by a French firm at plants located in Dunkirk, Sedan, and Belleville in France, and by an Italian firm whose plant was located near Taranto, Italy.

Moody International, an independent inspection firm, was employed by Lone Star to monitor and conduct inspections at every critical phase of the contract from the production of the flat plates through the manufacture of the pipe, then at the phase of loading the pipe from the steel mills to the ships, the loading upon the ships, the transportation by the ships, the unloading of the ships, and then to Ramsey's Storage Yard near the dock site at Houston, Texas. To be more specific, the contract provided that Moody would conduct five inspections: the first when the steel was rolled into flat plates before the pipe was made, and the last after the pipe was in the ground as a pipeline. Lone star had the right to reject (and did reject) the material at any time, from the date the plate was rolled (in Europe) until the pipeline was operational (in Texas). Lone Star by and through its independent inspection agents did inspect and reject pipe at every phase of the entire operation contemplated and covered by the contract, from the mills in Europe to the operational pipeline in Texas. These rejections caused delays and expense to Crispin and to the manufacturers concerned.

Crispin was responsible for the transportation of the pipe from the European steel mills by rail and water to Houston, Texas, and from there to the final transportation point near Houston. The contract required Crispin to carry insurance payable to Lone Star during this transportation phase.

The contract provided that title of the pipe would pass from Crispin to Lone Star when the pipe was loaded on the railroad carrier at the mill, that is to say, "FOB mill," which was in Europe. The pipe was stencilled at the mill and there identified to the contract.

The shipments were made pursuant to the contract from August 1972 through December 1972, and in all 1.28 million feet (or approximately 242 miles) of pipe were invoiced and delivered to Lone Star. After the pipe arrived at the port of Houston, Texas, it was first taken to Ramsey's Storage Yard near the docksite and then to a place in or near Houston operated by a firm called "Surfcote," which firm coated the exterior and interior of the pipe to protect the pipe from corrosion after it was placed in the ground. The pipe was thereafter loaded upon Lone Star's trucks and directed to one of six pipe-laying spreads on Lone Star's right-of-way in West Texas. After all the pipe had been laid, it was subjected to a hydrostatic test for checking against leaks. At this stage there were three failures of the foreign pipe, the expense for all of which were paid by the companies responsible.

Subsequent to the completion of Pipeline X, Lone Star was audited by the State Comptroller of Public Accounts, after which Lone Star was assessed the taxes in question. Lone Star paid these assessed taxes under protest, and thereafter made a claim for refund which was denied. Then after exhausting its administrative remedies, Lone Star filed suit in a District Court of Travis County, Texas, for refund of the taxes paid, which resulted in the judgment in favor of Lone Star for recovery of the taxes paid.

Appellants' points of error oblige us to deal with these basic questions:

(1) Was the pipe subject to the sales tax, as a sale of taxable items within this State?

(2) If the pipe was not subject to the sales tax, then was it subject to the use tax, or was it exempted from the use tax under Article 20.04(G)(3)(a), on the basis that Lone Star was a "licensed and certificated carrier"?

(3) If the pipe was not subject to the sales tax, was it nevertheless subject to the use tax by virtue of its "storage" in Texas before it was put into the pipeline, even if Lone Star is a "licensed and certificated carrier"?

■ We revert to the first question, that is, was the pipe subject to the sales tax, as a sale of taxable items within this State. We are of the opinion and hold that the pipe was not subject to the sales tax.

Article 20.02, Taxation-General, V.T.C.S., provides:

"There is hereby imposed a limited sales tax at the rate of four percent (4%) on the receipts from the *sale at retail of all taxable items within this state.*" (emphasis supplied).

Article 20.01(K) provides in its pertinent parts:

"(1)(a) 'Sale' means and includes any transfer of title or possession, or segregation in contemplation of transfer of title or possession, . . . in any manner or by any means whatsoever, of tangible personal property for a consideration."

"(2) 'Sale' includes: . . .

"(e) A transfer for a consideration of the title or possession of tangible personal property which has been produced, fabricated or printed to the special order of the customer."

The contract specifically provides that title to the pipe passed from Crispin as Seller to Lone Star as Buyer at the steel mills where produced, all of which were in Europe, and none of which were "within this State." The parties had the right to explicitly agree on the manner and conditions under which title would pass, and they did so. See Article 2.401(a), Texas Business and Commerce Code, V.T.C.S.; *Day and Zimmerman v. Calvert* (Tex.1975) 519 S.W.2d 106, 110.

The definition of the term "sale" as hereinabove quoted, speaks of a transfer of title or possession, or a segregation in contemplation of a transfer of title or possession. This pipe was "segregated" at the mills because it was specially manufactured for Lone Star and each pipe was stencilled there to identify it for Lone Star.

Our Supreme Court has held that when materials are loaded upon trucks of a common carrier or other means of transportation, a "segregation in contemplation of transfer of title or possession" occurred and a sale takes place between the vendor and vendee under the provisions of the Limited Sales, Excise, and Use Tax Act. *Gifford-Hill and Co. v. State* (Tex.1969) 442 S.W.2d 320, 323; *Day and Zimmerman v. Calvert* (Tex.1975) 519 S.W.2d 106, 110.

Appellants argue that the pipe is subject to the sales tax on the theory that there was a "transfer of possession" of the pipe at Houston, Texas, from Crispin to Lone Star. The holdings in *Gifford-Hill* and in *Day and Zimmerman* in our view foreclose this argument. Moreover, although Crispin was responsible for the transportation of the pipe from the European mills to Houston, Texas; yet during all those times the pipe was subject to the control of Lone Star by virtue of its inspections. In other words, during these times Crispin was acting as a bailee of the pipe holding possession for the benefit of the bailor and owner, Lone Star. This is further borne out in that the contract provided that Crispin insure the pipe during this phase for the benefit of and payable to Lone Star. For these reasons, we believe and hold that the pipe was not subject to the sales tax.

■ We now pass to the second question, and that is: Was the pipe subject to the use tax, or was it exempted from the use tax under Article 20.04(G)(3)(a), on the basis that Lone Star was a "licensed and certificated carrier"? We are of the opinion and hold that under this record Lone Star was a "licensed and certificated carrier" and therefore the pipe was exempted from the State use tax.

Article 20.03, Taxation-General, V.T.C.S. in its pertinent parts provides:

"An excise tax is hereby imposed on the storage, use or other consumption in this State of taxable items purchased, . . . "from any retailer for storage, use or other consumption in this State, at the same percentage rate as is provided in Article 20.02 of this title, on the sales price of the taxable item . . . ."

"Storage" is defined in Article 20.01(N) as follows: " 'Storage' includes any keeping

or retention in this State for any purpose except sale in the regular course of business or subsequent use solely outside this State of tangible personal property purchased from a retailer."

Article 20.01(R) in its pertinent parts defines "use" as follows:

" 'Use' includes the exercise of any right or power over tangible personal property incident to the ownership of that tangible personal property except that it does not include the sale of that tangible personal property in the regular course of business or the transfer of tangible personal property as an integral part of a taxable service rendered in the regular course of business. 'Use' specifically includes the incorporation of tangible personal property *into real estate or into improvements upon real estate* . . . ."

Article 20.04(G)(3)(a) provides for an exemption to the use tax as follows:

"(3) Special Use Tax Exemption. The use tax imposed herein shall not apply to:

"(a) The use, in this State, of tangible personal property which is acquired outside this State and which is moved into this State for use as a licensed and certificated carrier of persons or property."

In the case at bar, Lone Star was the holder of a permit from the Railroad Commission of Texas for the operation of gas pipelines, which included "Line X."

Appellants contend that Lone Star's "permit" is not to be construed as to be included as a "license" or "certificate" so as to entitle Lone Star to be a "licensed and certificated carrier" within the meaning of Art. 20.04(G)(3)(a). We do not agree. Our Supreme Court has held that the term "permit" is synonymous with the term "license." *Motl v. Boyd* (1926) 116 Tex. 82, 286 S.W. 458, at p. 475. Also see *Ex Parte Truelock* (1940) 139 Tex.Cr.R. 365, 140 S.W.2d 167, at p. 174. We therefore believe and hold that the pipe in question was exempted from the use tax under Article 20.04(G)(3)(a).

■ Finally, Appellants contend that even though Lone Star was a licensed and certificated carrier, that the pipe was subject to the use tax because it was "stored" in Texas after it arrived in Texas and before it was used as part of the pipeline. We do not agree. The proof showed that the pipe was stored in Texas at varying periods not less than six days nor more than sixty-nine days before being laid in the ground as a pipeline. It is undisputed that the pipe was intended for use as a gas pipeline (Line X) at all times material to this controversy, and for no other use, including the time it was stored in Texas preparatory to being made into the pipeline. To hold that the pipe was subject to the use tax during the storage phase would render the exemption under Article 20.04(G)(3)(a) meaningless and would, we believe, be a misconstruction of this exemption statute.

We have given careful attention to and consideration of all of Appellants' points and contentions, and overrule all of same as being without merit. Judgment of the trial court is accordingly affirmed.

AFFIRMED.