Bob BULLOCK, Comptroller of Public Accounts, et al., Petitioners,

v.

LONE STAR GAS COMPANY, Respondent.

No. B–7311.

Supreme Court of Texas.

June 7, 1978.

Rehearing Denied July 12, 1978.

**494**

John L. Hill, Atty. Gen., Martha E. Smiley and Myra A. McDaniel, Asst. Attys. Gen., Austin, for petitioners.

Clark, Thomas, Winters & Shapiro, Michael L. Cook and Monty G. Humble, Austin, for respondent.

STEAKLEY, Justice.

Lone Star Gas Company instituted this suit to obtain a refund of state and local sales and use taxes paid on pipe imported from Europe and laid in a Lone Star Gas pipeline used by Lone Star in the intrastate sale and distribution of gas in Texas. The trial court, after a non-jury trial, rendered judgment for Lone Star and ordered a refund of the taxes with interest. On appeal by the State, the Court of Civil Appeals affirmed the judgment. 558 S.W.2d 566. We reverse those judgments and render judgment that Lone Star take nothing in its suit.

In early 1972, Lone Star embarked upon the construction of a 400 mile pipeline from Coyonosa in Pecos County, Texas, to Cedar Hill in Dallas County, Texas. The pipeline was designated Line X and was designed to bring natural gas from the Delaware Basin production field to the Dallas area. It was the purpose of Lone Star to complete at least a portion of the line during 1972 in order to reduce its federal tax liability. Lone Star also desired to avail itself of the then prevailing lower prices available on foreign steel products. The company struck a balance between its two goals by purchasing approximately one-half of the necessary pipe from domestic steel companies from whom prompt delivery could be expected, with the remainder to be purchased from less accessible but more economically attractive foreign manufacturers. The management personnel at Lone Star were unskilled in international transactions and it was determined that the company would seek quotations from brokers and suppliers of foreign steel products.

The Crispin Company supplied a quotation under which it would obtain pipe manufactured to Lone Star's unique specifications from European manufacturers and would deliver it to Lone Star in Houston, Texas. Crispin supplemented this proposal with another in which it would assume the additional responsibility of coating the pipe with anti-corrosive agents and transporting it to the Lone Star job sites. In time, on June 9, 1972, a contract between Lone Star and Crispin was executed, titled a "Sales Contract for High-Test Line Pipe And Transportation Agreement." The contract differed substantially from the proposals initially submitted by Crispin.

Under the terms of the contract, Crispin was the seller of the pipe and Lone Star the buyer. The contract specifically called for title to the pipe to pass from Crispin to Lone Star at the mills in Europe. Separate provisions called for Crispin to be responsible for transporting the pipe from the mills in France and Italy to a debarkation port in Europe; for shipping the pipe from Europe to Houston; for unloading the ships and storing the pipe in a Houston dockyard storage area; and for transporting the pipe

from the storage area to a commercial pipe treatment facility. Separate consideration was stated in the contract for the purchase price of the pipe and for the transportation charges. These were to be paid by Lone Star after delivery of the pipe in Houston. Crispin assumed the risks of loss during transportation and agreed to hold Lone Star harmless for any casualties during transit. Lone Star retained the right to inspect the pipe at any phase of manufacturing and shipment, and to reject defective or damaged portions. Lone Star also retained the right to cancel the contract if and when the delivery schedule for the pipe was not met, subject to its ability to obtain the pipe from another source for earlier delivery.

With only minor deviations, the purchase and transportation of the pipe was completed pursuant to the terms of the contract. Upon arrival at Houston, the various shiploads of pipe were offloaded and stored at the Ramsey Storage Yard at the port. The amount of time a particular shipload of pipe remained at the storage yard varied. Some pipe remained in storage for no more than six days, while other pipe remained for more than sixty days. Most of the pipe was moved from storage to the Surfcote Coating Corporation plant in Houston, where it was given anti-corrosion treatment before being moved to the job sites in West Texas. A small portion of the pipe was transferred directly from storage to the job sites and was coated there. Line X was completed in June, 1973, and in September, 1973, the Railroad Commission issued Lone Star a permit to operate the pipeline. Lone Star, without protest, paid state use taxes on the pipe in the amount of $670,886.29. The Comptroller later conducted an audit of the company and assessed a local use tax of $138,216.23. Lone Star paid the local tax under protest and filed a claim for refund of both the state and local taxes. The Comptroller denied the claim for refund and Lone Star brought this action.

The applicable statutory provisions, Article 20.01, et seq.,[1] are, with italics added, as follows:

Art. 20.01 Title—Definitions

This Chapter is known and may be cited as the *"Limited Sales, Excise and Use Tax Act,"* and the following words shall have the following meanings unless a different meaning clearly appears from the context:

.    .    .    .    .

*(K) Sale.*

(1)(a) "Sale" means and includes any transfer of title or possession, or segregation in contemplation of transfer of title or possession, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration.

.    .    .    .    .

*(N) Storage.* "Storage" includes any keeping or retention in this State for any purpose *except* sale in the regular course of business or subsequent use solely outside this State of tangible personal property purchased from a retailer.

*(O) Storage and Use Exclusion.* "Storage" and "Use" do not include the keeping, retaining or exercising of any right or power over tangible personal property for the purpose of subsequently transporting it outside the State for use thereafter solely outside the State, or for the purpose of being processed, fabricated or manufactured into, attached to, or incorporated into, other tangible personal property to be transported outside the State, and thereafter used solely outside the State.

.    .    .    .    .

*(R) Use.* "Use" *includes* the exercise of any right or power over tangible personal property incident to the ownership of that tangible personal property except that it does not include the sale of that tangible personal property in the regular course of business or the transfer of tan-

1. Title 122A, Taxation-General, 20A, Tex.Rev. Civ.Stat.Ann. (1969). Unless otherwise indicated, all statutory references hereafter will be to articles and sections of this Act.

gible personal property as an integral part of a taxable service rendered in the regular course of business. "Use" specifically includes the incorporation of tangible personal property into real estate or into improvements upon real estate without regard to the fact that such real estate and improvements may subsequently be sold as such except as provided in Article 20.01 (T)(2).

. . . . . .

Art. 20.02 Imposition of Limited Sales Tax

There is hereby imposed a limited sales tax at the rate of four per cent (4%) on the receipts from the sale at retail of all taxable items within this State.

Art. 20.03 Imposition and Rate of Use Tax

An excise tax is hereby imposed *on the storage, use or other consumption* in this State of taxable items purchased, leased or rented from any retailer *for storage, use or other consumption* in this State, at the same percentage rate as is provided in Article 20.02 of this Title, on the sales price of the taxable item, or in the case of leases or rentals, on said lease or rental prices.

Art. 20.04 Exemptions

. . . . .

(G) Interstate Shipments.

. . . . .

(3) Special *Use Tax* Exemption. The use tax imposed herein shall not apply to:

(a) The *use*, in this State, of tangible personal property which is acquired outside this State and which is moved into this State for use as a licensed and certificated carrier of persons or property.

(b) The temporary *storage* in this State of tangible personal property which is acquired outside this State and which, subsequent to being brought into this State and *stored here temporarily, is used solely outside this State* or is physically attached to or incorporated into other tangible personal property which is *used solely outside this State.*

(c) The *storage, use or consumption* of tangible personal property which is acquired outside this State, the sale, lease or rental *or* the storage, use or consumption of which tangible personal property would be exempt from the limited sales or use tax were it purchased within this State.

(d) The *storage and use*, in this State, of tangible personal property acquired outside this State for use as a repair or replacement part for and actually affixed in this State to a self-propelled vehicle which is a licensed and certificated common carrier of persons or property.

. . . . .

(K) *Use Tax* Inapplicable When Limited Sales Tax Applies or When Use Tax Previously Paid. The *storage, use or other consumption* in this State of taxable items, the receipts from the sale, lease, rental or use of which are required to be included in the measure of the limited sales tax, or taxable items upon which a use tax has been paid by the taxpayer using said taxable items, is exempted from the *use tax* imposed by this Chapter.

. . . . .

▮▮▮▮ The Comptroller contends that the pipe transaction in question subjected Lone Star to the imposition of the State and local taxes upon each of these statutory bases: as a *Sale* of the pipe under Arts. 20.02 and 20.01 (K); as a *Use* of the pipe under Arts. 20.03 and 20.01 (R); and as a *Storage* of the pipe under Arts. 20.03 and 20.01 (N). Lone Star contends, on the other hand, that there is not a taxable event in either statutory instance. As we understand, Lone Star does not deny that there was a storage and a use of the pipe in Texas within the terms of Arts. 20.01 (N) and 20.01 (R); its position is that, notwithstanding, the use tax exemption of Art. 20.04 (G)(3)(a) is applicable alike to the use and to the storage of the pipe and exempts Lone Star from liability for a tax on either event. We hold that the Act imposes a separate tax on the use and

on the storage of items, and that the Art. 20.04 (G)(3)(a) exemption is inapplicable to the storage tax. This holding renders unnecessary consideration of the question of whether Lone Star is a licensed and certificated carrier of persons or property within the terms of the exemption, as well as whether there was a taxable sale in Texas.

■ Art. 20.03 imposes a tax on (1) the use of property, (2) the storage of property, and (3) the other consumption of property. These taxes are collectively called the Use Tax. Thus, when the Legislature speaks of the Use Tax, it refers not only to the tax on the use of property but also to the tax on storage and the tax on other consumption. It is clear from this that the exemptions provided in subsections (a) through (d) of Art. 20.04 (G) have definite meaning and are not "nullities" as argued by Lone Star. Subsection (a) exempts the "use" of certain property from the general "Use Tax." It does not exempt the storage or other consumption of property from the tax imposed on these activities by the "Use Tax." Likewise, subsection (b) exempts only temporary "storage" from the "Use Tax." No exemption is provided in this subsection for the use or "other consumption of property." Significantly, when the Legislature intended to exempt all of the activities taxed by the "Use Tax," it specifically stated that the (1) use, (2) storage, and (3) other consumption of a certain type of property would be exempt from the "Use Tax." See Art. 20.04 (G)(3)(c).

■ The tax on the storage, use or other consumption of property, generically known as the Use Tax, is designed to complement the Sales Tax imposed by Article 20.02 on "the receipts from the sale at retail of all taxable items within this State." The Sales Tax, by definition, can only reach those transactions which occur in this State. A tax upon the sale of items in another state would constitute an unconstitutional burden on interstate commerce. See, *McLeod v. J. E. Dilworth Co.*, 322 U.S. 327, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944). If the Sales Tax had been enacted without the complementary Use Tax, the burden of con-

tributing to the support of the government in this form of taxation would have fallen upon those consumers who purchased goods in this State. The purpose of the Use Tax, then, is to more evenly distribute the tax burden among all consumers by imposing a tax on the fruits of an interstate purchase as well as on the sale of property in the State. See *United Air Lines v. Mahin*, 410 U.S. 623, 638, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973); *American Airlines, Inc. v. State Board of Equalization*, 216 Cal.App.2d 180, 30 Cal.Rptr. 590 (Dist.Ct.App.1963).

■ In order to serve this purpose, the Use Tax includes a tax not only on the use of property but also on the storage of property. Most commonly the storage tax is imposed on property that is purchased in another jurisdiction, and is, therefore, not subject to state taxation; and which is thereafter used as part of an interstate commerce activity, also not a proper subject for state taxation. In *Southern Pacific Co. v. Gallagher*, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586 (1939), the United States Supreme Court held that the tax on storage could be validly imposed by the State of California on that "taxable moment when the former [goods purchased outside the state] had reached the end of their interstate transportation and had not begun to be consumed in interstate operation." 306 U.S. at 177, 59 S.Ct. at 393. See also, *Pacific Telephone and Telegraph Co. v. Gallagher*, 306 U.S. 182, 59 S.Ct. 396, 83 L.Ed. 595 (1939); *Northern Natural Gas Co. v. Lauterbach*, 251 Iowa 885, 100 N.W.2d 908 (1960); and *American Airlines, Inc. v. State Board of Equalization, supra.* The same reasoning is applicable here, where the pipe in question had reached the end of its international transportation and had not begun to be consumed in an activity claimed to be exempt from the tax on use.

■ The question of the liability of Lone Star for local sales and use taxes is controlled by what we have hereinabove held with respect to Art. 20.01, et seq. The Local Sales and Use Tax Act, Art. 1066c, Tex.Rev.Civ.Stat.Ann. (Supp.1978), imposes a tax on the storage of property concur-

rently with the imposition of the tax under Art. 20.01, et seq. Our holding that Lone Star is liable for the State Use Tax on the storage of the pipe renders Lone Star also liable for the local tax.

Accordingly, the judgments of the courts below are reversed and judgment is here rendered that Lone Star take nothing in its suit.