Bob BULLOCK, Comptroller of Public Accounts of the State of Texas, Appellant,

v.

SHELL PIPELINE CORPORATION, Appellee.

No. 13997.

Court of Appeals of Texas, Austin.

May 23, 1984.

Rehearing Denied June 13, 1984.

Jim Mattox, Atty. Gen., Maureen Bucek, Asst. Atty. Gen., Austin, for appellant.

David C. Duggins, Clark, Thomas, Winters, & Shapiro, Austin, for appellee.

Before SHANNON, EARL W. SMITH and GAMMAGE, JJ.

SHANNON, Justice.

Shell Pipeline Corporation filed suit in the district court of Travis County to recover $161,108.36 in use taxes paid under pro-

test to the Comptroller of Public Accounts. After a bench trial, the district court concluded that Shell was entitled to an exemption from the tax and accordingly rendered judgment that Shell recover the sum paid together with interest. This Court will affirm the judgment.

The Supreme Court in *Bullock v. Lone Star Gas Co.*, 567 S.W.2d 493 (Tex.1978) determined that Tex.Tax.-Gen.Ann. art. 20.-01 *et seq.*[1] imposed a separate tax on the storage of items and that the art. 20.-04(G)(3)(a) exemption is inapplicable to the storage tax. In district court, Shell argued successfully that its use of pipe in the construction of a pipeline did not subject it to the storage tax. Further, Shell prevailed in its argument that its operation entitled it to the benefit of the art. 20.-04(G)(3)(a) exemption. Art. 20.04(G)(3)(a) provides:

(3) Special Use Tax Exemption. The use tax imposed herein shall not apply to:

(a) The use, in this State, of tangible personal property which is acquired outside this State and which is moved into this State for use as a licensed and certificated carrier of persons or property.

The facts, concerning the question of storage, *vel non*, are not in dispute and may be briefed as follows. Shell, a common carrier pipeline, purchased the pipe in question in Birmingham, Alabama. The purchase of the pipe and the taking of title to the pipe occurred outside Texas. The pipe was inspected, coated, and prepared for installation outside Texas.

When and as needed for construction of the pipeline, the pipe was transported into Texas in truckloads and was delivered directly to the construction site for immediate installation. At the construction site the pipe was placed directly on the pipeline right-of-way or, where required by the terrain, on "athey wagons," rubber-tired vehicles used for transport on wet or muddy ground, which were employed to carry the pipe to the right-of-way. The pipe was strung along the right-of-way within minutes after its arrival by truck. An average of five truckloads of pipe each day, enough for that day's stringing operations, arrived during the construction process.

As pipe was laid along the right-of-way, it was inspected, aligned, welded into sections, coated at the joints, and transferred in sections into a ditch which was then filled. The workmen then pressure-tested the buried section. The period of time between the arrival of a truckload of pipe and the completion of laying, covering, and testing the pipe averaged three to five days, excluding weather delays. Each step of the procedure was performed by a separate crew, using an assembly-line process involving a total of about seventy crewmen working seven days a week, weather permitting. As sections of pipeline were completed, they were joined together until the entire pipeline was completed, a continuing process which took about a year. The pipeline ran from Mont Belview, Texas, to Napoleonville, Louisiana and when placed in operation transported ethylene, a by-product of petroleum.

With respect to Shell's liability for the storage tax, the district court in its findings of fact determined that none of the pipe in question was kept at the pipeline site longer than necessary for its incorporation into the pipeline. The court further found as a fact that Shell "did not store said pipe within the State of Texas." The court concluded that the pipe in question had never been in storage in Texas as that term is defined by Tex.Tax.-Gen.Ann. art. 20.01(N).

Concerning Shell's claim to the exemption from the use tax, the district court found that a tariff is on file with the Federal Energy Regulatory Commission pertaining to transportation charges and regulations for the use of the pipeline in question, and that the tariff had been accepted by the Commission. The court found further that on September 7, 1979, the Railroad

1. Unless otherwise indicated, all statutory references hereafter will be to articles and sections of Tex.Tax.-Gen.Ann. (1969).

Commission of Texas issued a permit to Shell to operate the pipeline.

The district court concluded that the "Permit to Operate Pipe Line" issued to Shell by the Railroad Commission is a "license" or "certificate" under the laws of Texas.

The court determined further that under 49 C.F.R. § 1300.0(a)(1)(i) (1982) authority to operate an interstate petroleum pipeline is obtained from the Federal Energy Regulatory Commission by the filing of tariffs. The Federal Energy Regulatory Commission has the power to deny authority to operate such a pipeline by rejecting said tariffs under 49 C.F.R. § 1300.14(e). The acceptance of such a tariff by the Federal Energy Regulatory Commission is a "license" or "certificate" to operate such a pipeline. The court concluded that pipelines are carriers of property within the meaning of the art. 20.04(G)(3)(a) exemption; that Shell is a licensed and certificated carrier of persons or property within the meaning of the exemption, and the pipeline in question is also a licensed and certificated carrier of property; and that the pipe which is the subject of this case is tangible personal property within the meaning of the exemption.

The court concluded finally that the pipe which is the subject of this case is exempt from the Texas use tax pursuant to art. 20.04(G)(3)(a).

The Comptroller claims in his first point of error that the district court erred in "finding and holding" that there was no "storage" of the pipe within Texas as defined in Tex.Tax.-Gen.Ann. art. 20.01(N) because such "ignores and violates the plain meaning of the storage tax."

In *Bullock v. Lone Star Gas Co., supra,* the taxpayer conceded that it had stored the property (pipe) before it had been put to use. In that case the taxpayer argued that the use tax exemption, art. 20.-04(G)(3)(a), was applicable alike to both the (1) use and (2) storage of the pipe and exempted the taxpayer from liability for a tax on either event. The Supreme Court rejected the taxpayer's contention and held that Tex.Tax-Gen.Ann. art. 20.01 *et seq.* imposed a storage tax separate and apart from the use tax and held that the art. 20.04(G)(3)(a) exemption was inapplicable to the storage tax. The Supreme Court was not required to, and *did not,* determine the elements necessary for the imposition of the storage tax because the taxpayer there conceded that it had stored the pipe before its use.

It is no wonder that the taxpayer in *Bullock v. Lone Star Gas Co., supra,* admitted "storage" of the pipe since the pipe there involved was unloaded in the port of Houston and "stored at the Ramsey Storage Yard at the port." *Id.* at 495. Some of the pipe remained in storage for no more than six days while other pipe remained in storage for more than sixty days. Most of the pipe involved in *Bullock v. Lone Star Gas Co., supra,* was moved from storage to a plant in Houston where it was given anti-corrosion treatment before being moved to the job sites in west Texas.

■ "Storage" is defined in art. 20.01(N) as including "any keeping or retention in this State for any purpose except sale in the regular course of business or subsequent use solely outside this State of tangible personal property purchased from a retailer." A common definition of the word "storage" is the "safekeeping of goods in a warehouse or other depository." Black's Law Dictionary (4th ed. 1968). The common thread in terms such as "storage," "keeping," and "retention" is the thought that something is held for future use.

■ Turning to the facts of this case, the pipe was purchased and treated outside Texas. It was brought in on trucks, unloaded at the job site and kept there no longer than necessary for its incorporation into the pipeline. The pipe was then inspected, aligned, welded into sections, coated at the joints, and transferred into the ditch where it was covered. Each step of the above described procedure was performed by a separate crew, using an assembly-line process involving a total of about seventy crewmen working seven

days a week, weather permitting. The time lapse from unloading the pipe from the trucks to filling of the ditch was from three to five days.

The facts resulting in the taxpayer's concession of storage in *Bullock v. Lone Star Gas Co., supra,* are absent in this appeal. For example in this appeal, there was no warehousing of pipe and the coating process was completed before the pipe was transported into Texas.

It may be fairly concluded that Shell did not keep or retain for future use the pipe which it brought into Texas. Rather, the pipe was brought to the job site and handled as expeditiously as possible consistent with weather conditions. The district court did not err in determining that Shell did not store the pipe in question and in concluding therefore that Shell was not liable for the storage tax.

In an effort to discharge its burden to bring itself within the art. 20.04(G)(3)(a) exemption, i.e., show that it used the pipe as a licensed and certificated carrier of property, Shell proved that (1) it held a permit to operate a pipeline from the Railroad Commission of Texas and that (2) it had filed a tariff with the Federal Energy Regulatory Commission.

The Comptroller insists, however, that Shell's obtaining the permit and filing the tariff "did not a licensed and certificated carrier it make." Rather, the Comptroller reserves unto himself the perogative to inquire into the nature of the license or certificate from a sister agency to determine whether he is satisfied that the license or certificate is one contemplated by the art. 20.04(G)(3)(a) exemption. For example, Roger Murphee, the Comptroller's "supervisor of tax policy, sales tax division" testified that the Comptroller does not accept *prima facie* a license or certificate from a sister agency, but instead he examines the circumstances of its issuance to determine whether the subject is a regulated carrier of persons or property for hire. This examination even involves the Comptroller's investigation of the sister agency's authority to issue the license or certificate.

The Comptroller levels a collateral attack of sorts against the permit issued Shell by the Railroad Commission. He subpoenaed a witness from the Commission in an effort to demonstrate that the Commission was without jurisdiction to issue the permit to Shell. The Comptroller then claims that even though the Railroad Commission issued the permit, it was powerless to enforce any sanctions against the pipeline company.

■ The Comptroller's attack raises the question whether an order or permit promulgated by one agency must be respected by another agency. In general, in the case of a regulated industry, primary and plenary jurisdiction is vested in the agency having general powers of regulation over that industry. Other state agencies should recognize the validity of the orders of the primary agency. *See* II Cooper, State Administrative Law 525 (1965).

■ It appears to this Court that the Railroad Commission has primary and plenary jurisdiction over the pipeline here involved. "The commission has jurisdiction over all ... persons owning or operating pipelines in Texas." Tex.Nat.Res.Code Ann. § 81.051(a)(3) (1978). "The commission may adopt all necessary rules for governing and regulating" those persons. Tex.Nat.Res.Code Ann. § 81.052 (Supp. 1984).

■ In addition to its general jurisdiction over pipelines, the Commission has the specific jurisdiction and duty to issue a permit or certificate of clearance for the transportation of *oil products* by pipelines. Tex. Rev.Civ.Stat.Ann. art. 6066a §§ 1(g) and 4(d) (1962). Oil products include "any and all ... by-products derived from crude petroleum oil or gas...." *Id.* § 1(c). By definition ethylene is a gas "derived from natural gas and petroleum." American Heritage Dictionary 450 (1973). The Commission's own rules specifically define ethylene as a petroleum product. Tex.R.R. Comm., 16 Tex.Admin.Code § 5.28(a) (Sept. 1, 1980).

Shell applied for and received a "Permit to Operate Pipe Line" from the Railroad Commission for this pipeline. This permit, to our knowledge, is the only permit, certificate, or license issued by the Commission to petroleum, natural gas, or petroleum products pipelines.

 There exists an additional reason to affirm the judgment. With respect to Shell's qualifying for the exemption to the use tax, the Comptroller's consistent view in the administrative proceedings was that Shell was a "licensed and certificated carrier." In his official position letter, filed at the contested administrative hearing and reviewed and approved by the Comptroller's tax division and tax policy division, the Comptroller's attorney stated "Petitioner [Shell] is a common carrier pipeline licensed and certificated by the Interstate Commerce Commission and by the Texas Railroad Commission."

In the Comptroller's decision on redetermination signed by the administrative law judge on January 20, 1981 and adopted in its entirety by the Comptroller by order dated March 9, 1981, finding of fact No. 1 recites "Petitioner [Shell] is a common carrier pipeline licensed and certificated by the Interstate Commerce Commission and by the Texas Railroad Commission."

In the Comptroller's decision on the refund hearing, signed by a different administrative law judge on April 27, 1982 and adopted in its entirety by the Comptroller by order dated May 26, 1982, finding of fact No. 1 recites "Taxpayer-petitioner [Shell] is a common carrier pipeline licensed and certificated by the Interstate Commerce Commission and by the Texas Railroad Commission."

In face of the Comptroller's repeated admissions and administrative fact findings, this Court is now witness to the spectacle of the Comptroller and his counsel fulminating against identical conclusions of the district court. The Comptroller and his counsel should not now be heard to com-

plain that Shell is not a licensed and certificated carrier.

The judgment is affirmed.