Filed 3/25/22  The House Modesto v. County of Stanislaus CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE HOUSE MODESTO,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF STANISLAUS,<br><br>Defendant and Respondent. | F081487<br><br>(Super. Ct. No. 2027505)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

Law Offices of Wade E. Norwood, Kenneth E. Franklin and Wade E. Norwood for Plaintiff and Appellant.

Dan Farrar for Defendant and Respondent.

-ooOoo-

Appellant The House Modesto (THM) is a church in the City of Modesto. THM brought this action to recover property taxes levied by respondent County of Stanislaus (County) and paid under protest for fiscal years 2013–2014 through 2019–2020. THM's action is premised on its claim of tax exemption (welfare exemption) under section 214 of the Revenue and Taxation Code.[1] At issue on appeal is the trial court's denial of THM's claim of exemption as to land upon which it operates a fitness center (House Fitness). THM argues the court erred in denying the exemption because House Fitness is incidental to, and reasonably necessary to, THM's religious purpose of ministering to the "'mind, body, soul and spirit'" of its congregants and its charitable purpose of supporting the physical well-being of Modesto residents. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The trial court decided this case upon facts stipulated by THM and County, the testimony of four witnesses, and documentary evidence introduced through witness testimony.[2]

### I. Procedural Background

On February 15, 2013, THM filed a claim with the Stanislaus County Assessor (the Assessor) for religious exemption of its real property. The Assessor granted the exemption as to approximately two-thirds of THM's property, but denied exemption for the remainder of the property—property upon which THM operated House Fitness, a coffee shop, and a multi-use classroom facility known as "KidSpace."

THM paid the taxes assessed against the property for fiscal years 2013–2014 through 2018–2019 under protest. In 2015, 2016 and 2019, it filed claims for the refund

---

[1] All statutory references are to the Revenue and Taxation Code unless stated otherwise.

[2] THM and County agreed upon certain factual assertions contained in two filed documents entitled, respectively, *Agreed Statement of the Case; Issues to Be Decided; Stipulated Facts* and *Stipulated Facts, Set Two*.

of those taxes with the Stanislaus County Auditor-Controller (2015 and 2019) and the Stanislaus County Board of Supervisors (2016), but no action was taken on the claims.

On March 27, 2019, THM filed claims for welfare exemption of the property for fiscal years 2013–2014 through 2019–2020. On September 3, 2019, the Assessor denied THM's welfare exemption claims.

THM filed this action to challenge the Assessor's denial of its exemption claims and seek a refund of taxes paid in protest. A bench trial was conducted. Upon receiving the trial court's tentative ruling on the matter, THM timely requested a statement of decision.

On May 12, 2020, the trial court issued a proposed statement of decision. The record on appeal does not reveal that any party objected to the proposed statement of decision. On June 3, 2020, the court issued its final statement of decision following court trial (Final SOD), which conformed to its proposed statement of decision.

In its Final SOD, the trial court determined KidSpace was used primarily for exempt purposes and ordered a refund of taxes attributable to the KidSpace property. However, the court found THM did not meet its burden of proof to establish the welfare exemption of House Fitness and the coffee shop.

On June 15, 2020, in accordance with its Final SOD, the trial court entered judgment in favor of THM in the amount of $96,558.45 plus interest in the amount of $7,055.73 through June 30, 2020.

On August 4, 2020, THM timely appealed the judgment as it related to House Fitness only and County timely cross-appealed. The cross-appeal was dismissed by this court on November 13, 2020, upon County's request.

II.     **Stipulated Facts**

At all times relevant, THM (formerly known as Calvary Temple Worship Center) was "an IRS tax-exempt [Internal Revenue Code] section 501[, subdivision ](c)(3)

3.

California non-profit religious corporation and has an organizational clearance certificate from the California State Board of Equalization."[3]

Prior to changing its name, THM had been historically exempt from paying property taxes on all of its property. As mentioned, in 2013 or 2014, the Assessor made a finding that approximately one-third of THM's property (including House Fitness) was not used exclusively for exempt purposes.

The parties' stipulations set forth a chronological history of (1) THM's claims for welfare exemption for fiscal years 2013–2014 through 2019–2020, (2) the amount of taxes THM paid for fiscal years 2013–2014 through 2018–2019, (3) THM's claims for refund, and (4) County's actions and nonactions on THM's claims.

The parties further stipulated House Fitness had been in operation since 1998 and is open to the public. In 2017, House Fitness had a paid monthly membership of approximately 469 members. In 2018, its paid monthly membership increased to approximately 842 members. In 2019, its monthly paid membership increased to approximately 1,112 members. It is situated on land comprising approximately 16.61 percent of THM's property.

## III. Testimony

THM called Pastor Michael D. Trenton to testify. At the time of trial, Pastor Trenton was the "number two in charge" at THM. He oversaw all operations of THM, its staff, and its leaders. He testified THM does not have an official membership. It has over 30,000 adherents that have attended services or made financial contributions to THM. Approximately 3,500 to 4,000 individuals attend weekend services regularly.

According to Pastor Trenton, THM has had to change its methods of outreach to the community. Because society offers so many different activities such as "health clubs,

---

[3] To establish the welfare exemption of property, an organization must obtain, and file with the assessor, an organizational clearance certificate pursuant to section 254.6 to demonstrate it meets the requirements of section 214. (§§ 214.8, subd. (b), 254.6, subd. (b).)

theme parks, you name it," THM had to find ways to "compet[e] with the world" to attract people to its ministry. Describing the various services and amenities (including House Fitness) offered to its congregants, Pastor Trenton explained, "[T]he whole purpose is to win the lost and, by whatever means we find necessary, to get people to our campus." "You may not always be able to get them to—to come to church, but they might respond to an invitation to come work out together. They might respond to come to a party or come check out the play structure .…"

Pastor Trenton testified, "House Fitness is a—basically, a fitness center. It's designed to be a gym, if you will. It consists of weights, treadmills, racquetball courts—two racquetball courts." "[H]ealth is a key attraction for families, and we want to minister to body, soul, mind, and spirit. A fitness center was a logical option. You look at the number of people that sign up for fitness centers in the community from In-Shape, to Cal Fit, or LA Fit, whatever you want to call it. They're all over Modesto. Fitness, health is an interest of anybody and everybody."

House Fitness has scripture references throughout the building. Videotapes of sermons, Christian music videos, and "a lot of different things" are played on its television sets. THM believes "the body is a temple of the Holy Spirit, and you take care of it." "It ministers to a very select group of people in terms of the kind of place they want to work out."

Pastor Trenton testified the purpose of House Fitness is not to contribute financially to THM, noting it has "lost over $800,000 in the last 20-plus years" of operation. He indicated the hope would be to break even or "cover the cost of the pastor who runs [it, and] the cost of repairing equipment."

5.

Pastor Trenton estimated the paid membership of House Fitness at approximately 1,100 individuals and membership fees at $19 per month. In 2019, the gross income of the fitness center was $147,889.76.[4]

THM also called Pastor Douglas Wayne Mattingly to the stand. Pastor Mattingly testified he was a staff pastor at THM and had been a staff member at THM since 2009. He served as the director of House Fitness in addition to other duties.[5]

Pastor Mattingly confirmed House Fitness is used as an "outreach tool." He uses peoples' attendance at House Fitness as an opportunity to speak to them about what is going on in their life and to counsel them. In his view, his primary purpose was "To meet the needs of the people that come to us. It's an outreach to love on, meet whatever their need is. It could be strengthening, getting stronger, but it also could be a hurt or a pain that's going on, whatever it might be. Just to help them along through in life and remind them how much they're loved."

Pastor Mattingly estimated 70 percent of the membership of House Fitness were regular attendees of the church. He testified the membership charge for students and seniors was $10 per month and, for others, $15 per month. Membership also entailed payment of an initial enrollment fee, but the amount of the fee was not elicited during trial. Pastor Mattingly testified House Fitness has occasionally waived enrollment and monthly fees for individuals unable to afford membership.

House Fitness generally does not advertise but, according to Pastor Mattingly, it did run an ad in his daughter's school newspaper once. Moreover, House Fitness had

---

[4]     Financial statements in evidence showed House Fitness earned gross income of $58,134.38 in 2013, $137,755.76 in 2014, $221,797.49 in 2015, $183,132.29 in 2016, $154,023.89 in 2017, $115,573.25 in 2018, and $147,889.76 in 2019.

[5]     The record is unclear whether Pastor Mattingly assumed his duties as director of House Fitness in 2009, or a later date.

previously offered discounted rates through Groupon, but those offerings were discontinued when Pastor Mattingly started as director of House Fitness.

County called Merete Meeks and Rose Marie Reavill to testify. Ms. Meeks was an appraiser with the Assessor's office. In 2013, she performed a field check of House Fitness and other buildings on the THM campus to determine if they were being used for religious purposes and to value new construction. She met with three individuals—THM's business agent, its pastor, and its facility director. She was told by the facility director that fees for House Fitness ranged from $10 to $50 for an individual, but Ms. Meeks was unsure how to interpret the statement. She stated, "The position of [THM] is that all of their activities, with respect to the use of their space, are for community outreach. The goal is to bring new members to the church. Donation/fee required for various activities."

Ms. Reavill processed claims of exemption for the Assessor. She testified that when THM changed its name from Calvary Temple Worship Center, the Assessor required a new filing. Relying primarily on information provided by Ms. Meeks, Ms. Reavill determined House Fitness (and other facilities) were not being used exclusively for religious purposes.

Through its witnesses, THM was able to introduce into evidence its restated and amended articles of incorporation, its mission statement, photographs of House Fitness, excerpts from House Fitness's website, and financial records for House Fitness.

**DISCUSSION**

**I.       The Welfare Exemption**

Article XIII, section 1 of the California Constitution provides, in part: "Unless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value.…" Article XIII, section 4, subdivision (b), of the Constitution authorizes the Legislature to exempt from taxation "Property used exclusively for religious, hospital, or charitable

7.

purposes and owned or held in trust by corporations or other entities (1) that are organized and operating for those purposes, (2) that are nonprofit, and (3) no part of whose net earnings inures to the benefit of any private shareholder or individual." Prior to November 5, 1974, the above mentioned authorization was contained in former section 1c of article XIII of the California Constitution.[6] (*English v. County of Alameda* (1977) 70 Cal.App.3d 226, 234, fn. 1.)

Pursuant to its constitutional authorization, the Legislature enacted section 214. It reads, in pertinent part:

> "(a)    Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations, limited liability companies, or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation …, if:

> "(1)    The owner is not organized or operated for profit.…

> "(2)    No part of the net earnings of the owner inures to the benefit of any private shareholder or individual.

> "(3)    The property is used for the actual operation of the exempt activity, and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose." (§ 214, subd. (a).)

Section 214 is to be given a "strict but reasonable construction." (*Cedars of Lebanon Hosp. v. County of L.A.* (1950) 35 Cal.2d 729, 735 (*Cedars*).) We must give "due regard for the ordinary acceptation of the language employed and the object sought to be accomplished thereby." (*Ibid.*)

---

[6]    Former section 1c of article XIII of the California Constitution read, in pertinent part: "'In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation *all or any portion of property* used exclusively for religious, hospital or charitable purposes and owned by community chests, funds, foundations or corporations organized and operated for religious, hospital or charitable purposes, not conducted for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.…'" (*English v. County of Alameda, supra*, 70 Cal.App.3d at p. 234, fn. 1.)

Property "used exclusively for any facility which is incidental to and reasonably necessary" to a religious, hospital, scientific, or charitable purpose will qualify for welfare exemption. (*Cedars, supra*, 35 Cal.2d at p. 736; accord, *Y.M.C.A. v. County of L.A.* (1950) 35 Cal.2d 760, 767 (*Y.M.C.A.*).)

"[T]he test for the welfare exemption is not the number of good purposes to which plaintiff's property may be put nor the amount of benefit that may be derived therefrom by plaintiff's members as well as the general public, but whether the property may reasonably be regarded as 'exclusively used' for exempt purposes." (*Y.M.C.A., supra*, 35 Cal.2d at pp. 774–775.) Exclusive use in this context means the property is used "*primarily* for exempt purposes." (*Peninsula Covenant Church v. County of San Mateo* (1979) 94 Cal.App.3d 382, 394.) In determining whether property is exclusively used for exempt purposes, the fact that a facility may have one or more secondary purposes "does not destroy the effect of [its] dominant purpose as property 'used exclusively for religious … or charitable purposes' within the contemplation of the welfare tax exemption law." (*Y.M.C.A., supra*, at p. 770.)

At trial, THM, "ha[d] the burden of showing that [it] clearly c[a]me within the terms of the [welfare] exemption." (*Cedars, supra*, 35 Cal.2d at p. 734.)

## II. Standard of Review

The parties disagree as to the proper standard of review on appeal. THM contends the matter should be reviewed de novo because it involves the application of law to undisputed facts or, alternatively, a mixed question of law and fact. County contends this court must give deference to the trial court's factual determinations and reverse only if the evidence compels a ruling in THM's favor as a matter of law. We agree with County.

County relies on *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828 (*Dreyer's*). In *Dreyer's*, the plaintiff challenged an assessment of property taxes on its manufacturing equipment. (*Id*. at p. 832.) A hearing was conducted before the Assessment Appeals Board (the board). (*Ibid.*) At the conclusion of the

9.

hearing, the board expressly found the plaintiff did not meet its burden of proof. (*Id.* at p. 834.) The trial court affirmed the board's decision, and the plaintiff appealed. (*Id.* at pp. 834–835.)

In determining the proper standard of review, the *Dreyer's* court wrote, "'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]'" (*Dreyer's*, *supra*, 218 Cal.App.4th at p. 838.) In doing so, "[t]he appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment. [Citation.] '"All conflicts, therefore, must be resolved in favor of the respondent." [Citation.]'" (*Ibid.*)

THM argues *Dreyer's* should not apply because the initial determination in *Dreyer's*, the value of property being assessed, was within the exclusive jurisdiction of the assessment appeals board whereas the determination of tax exemption, as in this case, is an issue belonging exclusively to the courts. THM does not adequately articulate why it contends such a distinction is relevant and we do not believe it is. The standard set forth in *Dreyer's* has been utilized in a variety of contexts. (E.g., *In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227 [juvenile proceedings]; *Estate of Herzog* (2019) 33 Cal.App.5th 894, 904 [probate]; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465–466 [civil bench trial]; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528, disapproved on unrelated grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 [juvenile proceedings]; *Lent v. Cal. Coastal Com.* (2021) 62 Cal.App.5th 812, 837 [administrative]; *Superior Court v. Public Employment Relations Bd.* (2018) 30 Cal.App.5th 158, 221 [administrative].)

THM further contends this court is not bound by the trial court's findings of fact. In support of its position, THM relies on *Western Contracting Corp. v. State Board of Equalization* (1968) 265 Cal.App.2d 568, *Standard Register Co. v. Franchise Tax Board* (1968) 259 Cal.App.2d 125, and *Dealers Installation Service, Inc. v. State Bd. of Equal.* (1970) 13 Cal.App.3d 395. THM's reliance is misplaced. Unlike the case at bar, none of the three cases relied upon by THM involved an adverse credibility determination by the trier of fact. As will be discussed later in this opinion, the trial court determined that certain material testimony of Pastor Mattingly was not credible.

"The credibility of the testimony offered by the parties is properly determined by the trier of fact, and its determination is binding on an appellate court if supported by substantial evidence." (*Crescendo Corp. v. Shelted, Inc.* (1968) 267 Cal.App.2d 209, 212.) A trier of fact may reject uncontroverted evidence if, for example, it deems the evidence inherently improbable or otherwise not credible. (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659–660; *Camp v. Ortega* (1962) 209 Cal.App.2d 275, 282–283.) "Provided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted." (*Hicks v. Reis, supra*, at pp. 659–660; *Palmieri v State Personnel Bd.* (2018) 28 Cal.App.5th 845, 857.) Here, unless the trial court acted arbitrarily, we are bound by its credibility determination.

In our view, the review standard set forth in *Dreyer's* is appropriately applied to the case at bar. The review standard incorporates the substantial evidence standard for reviewing the trial court's findings of fact. In doing so, it gives proper deference to the trial court's role as trier of fact. It also acknowledges it was THM's burden to prove its entitlement to the exemption by limiting reversal to situations in which a finding in favor of THM is compelled as a matter of law.

## III.    Status of House Fitness

THM contends House Fitness serves both a religious and charitable purpose within the meaning of section 214.

## A. Religious Purpose

THM argues House Fitness is incidental to and reasonably necessary to its mission of "ministering to the whole person, 'the body, soul, mind, and spirit[]'" and "caring for the physical body." When asked why THM opened House Fitness, Pastor Trenton testified: "Again, appealing to meet the needs of families. Obviously, health is a key attraction for families, and we want to minister to body, soul, mind, and spirit."

As further support for its claim of welfare exemption for religious purposes, THM also refers to scriptural references contained in its restated and amended articles of incorporation wherein it is stated, "We believe that God wants to heal and transform us so that we can live healthy and prosperous lives .…"

THM also notes there are numerous biblical scriptures located throughout House Fitness or on its website including "'discipline leads to life and health.' Isaiah 38:16," "'I discipline my body like an athlete, training it to do what it should.' 1 Corinthians 9:27," and "Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; you were bought at a price. Therefore[,] honor God with your bodies.—1 Corinthians 6:19–20."

Although the above sentiments may be considered laudable and may be expressed in various ways by THM, they do not necessarily transform House Fitness into a facility used exclusively or primarily for religious purposes. In its Final SOD, the trial court expressly found THM did not meet its burden of proof to establish the welfare exemption for House Fitness. In support of this finding, the court wrote, in part:

> "After careful consideration of each facility's use, membership size, configuration, amenities, and the fact that it is run by a dedicated pastor, the Court concludes that [House Fitness] is not operated primarily for an exempt purpose. The primary use of the facility is for exercise, not for evangelistic purposes, although outreach and ministry are stated to be a part of the program. [Citation.] It may provide an opportunity for fellowship, but it has not been shown that it primarily provides such an opportunity.…

Moreover, [House Fitness] is not integrated into any educational or worship program."

The trial court noted several proof deficiencies in THM's case-in-chief as it related to House Fitness. The court wrote, in part: "Except for evidence of the number of gym members, there was no quantitative evidence or testimony as to the number of gym members who receive Christian mentoring at the facility, nor testimony as to the number of gym members who engage in Christian fellowship at the gym." The court noted that, even in the absence of documentary evidence, THM could have estimated those numbers in witness testimony, but did not. Similarly, no estimates were provided as to the amount of time spent by Pastor Mattingly, the director in charge of House Fitness, in engaging in such activities. The court noted that Pastor Mattingly testified he was "'constantly' doing certain things" but considered the testimony "troubling considering the general activities of a gym, and … not credible without some quantitative evidence .…"[7]

Here, the trial court found the testimony of Pastor Mattingly—that he was "'constantly'" counseling House Fitness members at the facility or calling them when he had not seen them for some time—not credible. It wrote, "the Court is left to speculate as to whether those receiving Christian fellowship or mentoring is nominal, moderate or significant when compared to the total gym membership and total time spent engaging in these activities."

The trial court reasonably could have found Pastor Mattingly's testimony inherently improbable and not entitled to credit. (See *Hicks v. Reis, supra*, 21 Cal.2d at pp. 659–660; *Camp v. Ortega, supra*, 209 Cal.App.2d at pp. 282–283.) We cannot say the court acted arbitrarily in making this determination. (See *Hicks v. Reis, supra*, at

---

[7] Pastor Mattingly testified, "We have people come in all the time that are not even members, but they'll bring their friend and they—[*sic*] Pastor Doug prayed for me last week, and he can pray for you. Share your story. Share what you're hurting. What's going on? So we have that constantly happening all the time." He also testified, "I don't know how other fitness centers are, but I'm constantly calling our people all the time when I haven't seen them, check how they're doing, see how their family's doing."

13.

pp. 659–660 [so long as trier of fact does not act arbitrarily, he or she may reject uncontradicted witness testimony]; *Palmieri v State Personnel Bd., supra*, 28 Cal.App.5th at p. 857 [same].) Accordingly, we defer to the court's finding the testimony was not credible.

Pastor Trenton noted that THM was competing with the world to attract people to its ministry. He noted, "[T]he whole purpose is to win the lost and, by whatever means we find necessary, to get people to our campus." "You may not always be able to get them to—to come to church, but they might respond to an invitation to come work out together. They might respond to come to a party or come check out the play structure …." Pastor Mattingly testified that he views House Fitness as "an outreach to love on, meet whatever their need is. It could be strengthening, getting stronger, but it also could be a hurt or a pain that's going on, whatever it might be." He indicated House Fitness serves as an "entry point into the church."

However, the trial court further noted House Fitness "is not integrated into any educational or worship program." Plainly, such an integration could have had a bearing on the outcome of trial, but evidence of any such integration was lacking at trial. "'[W]here a party has an opportunity to call a witness who is prepared and qualified to testify as to a fact in issue and fails to do so, it may be inferred by the trier of fact that the evidence if given would be adverse to such party.'" (*People v. Vaughn* (1968) 262 Cal.App.2d 42, 55.) If evidence existed to demonstrate that House Fitness was integrated into an education or worship program at THM, Pastors Trenton or Mattingly certainly would have been qualified and prepared to so testify. In the absence of such testimony, the court was entitled to infer that no such integration existed.

Physical fitness, by itself, is generally a secular ideal. (See *Bronx Household of Faith v. Bd. of Educ. of New York* (2011) 650 F.3d 30, 57.) Even when originally developed in connection with a recognized religion, physical fitness is secular in nature if not otherwise anchored to a religious purpose. (See *Sedlock v. Baird* (2015) 235

14.

Cal.App.4th 874, 886–887.) From the testimony of Pastors Trenton and Mattingly, the lack of integration of House Fitness into a worship or educational program, and the lack of quantifiable evidence concerning the amount of Christian fellowship or mentoring that occurred onsite, the trial court could reasonably infer that the *primary* purpose of House Fitness was exercise (i.e., secular) rather than religious.

Upon viewing all factual matters most favorably in support of the judgment, we cannot say the evidence compels a ruling in THM's favor as a matter of law. The evidence is not of such a character and weight as to preclude the trial court's finding that THM did not meet its burden of proof to show House Fitness was entitled to a welfare exemption based on exclusive use for a religious purpose.

## IV.    Charitable Purpose

THM contends on appeal that the trial court erred by limiting itself to consideration of whether House Fitness was used exclusively for religious purposes when House Fitness had a broader welfare exemption available to it as property exclusively used for charitable purposes.

The record on appeal does not reveal that any party objected to the trial court's proposed statement of decision pursuant to subdivision (g) of California Rules of Court, rule 3.1590, or brought a motion for a new trial (Code Civ. Proc., § 657) or to set aside the judgment (*id*. at § 665). Consequently, THM has waived the right to claim error based on any alleged deficiency in the statement of decision and this court may "infer the trial court made implied factual findings to support the judgment." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59; accord, *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134; Code Civ. Proc., § 634.)

California gives a broad construction to the term "charitable" as used in section 214. (*Stockton Civic Theatre v. Board of Supervisors* (1967) 66 Cal.2d 13, 18 (*Stockton*).) "[T]he term 'charity' has been defined in a number of California cases as "'a gift, to be applied consistently with existing laws, for the benefit of an indefinite number

15.

of persons—either by bringing their hearts under the influence of education, or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government." [Citations.]'" (*Id.* at p. 19.) "[C]harity is not confined solely to the relief of the needy and destitute, but comprehends '"as well activities which are humanitarian in nature and rendered for the general improvement and betterment of mankind, though the recipients of such benefits may be able to pay at least in part therefor.…"'" (*Ibid.*) "Implicit in this standard is the requirement that a charitable activity serve 'either the community as a whole or an unascertainable and indefinite portion thereof.'" (*Clubs of Cal. for Fair Competition v. Kroger* (1992) 7 Cal.App.4th 709, 716 (*Kroger*), quoting *Stockton, supra*, at pp. 19–20.)

House Fitness is open to the public. It charges an enrollment fee of an unspecified amount. Depending on which witness's testimony is credited, monthly dues (1) ranged from $10 per month for student and seniors and $15 per month for others (Pastor Mattingly's testimony); (2) are approximately $19 per month (Pastor Trenton's testimony); or (3) range from $10 to $50 per month (Ms. Meeks's testimony). According to the testimony of Pastor Mattingly, House Fitness has previously waived monthly fees for some members. However, no testimony was provided as to the frequency of such fee waivers. The evidence established that House Fitness did not make a profit during the years in question and financial statements for House Fitness were entered into evidence. Yet, no testimony was elicited concerning details of the line item entries contained in those statements.

THM contends the fees charged were nominal and are not designed to make House Fitness profitable. Yet, no evidence was elicited as to how the unspecified enrollment fees and monthly membership fees were determined. No evidence was provided to compare or contrast the enrollment and membership fees of other fitness centers operated for profit.

Given the fact that THM does not generally advertise House Fitness's offerings and Pastor Trenton's testimony that "[i]t ministers to a very select group of people in terms of the kind of place they want to work out," the trial court could have reasonably found House Fitness was not designed to serve "'the community as a whole or an unascertainable and indefinite portion thereof'"—a hallmark of charitable activity. (*Kroger, supra*, 7 Cal.App.4th at p. 716.) The court could have inferred House Fitness served only THM adherents or congregants along with their friends or guests. Such an inference would not be inconsistent with the court's finding that House Fitness was not used primarily for religious purposes since membership, by itself, does not establish the type of use to which the facility was employed.

Moreover, the trial court could have found THM did not meet its burden of demonstrating that House Fitness was a charitable enterprise. The court could have determined that the unspecified enrollment fee and the monthly membership fees were not shown to be nominal due to the lack of evidence concerning enrollment and membership fees of competing gyms and that the lack of profit did not establish the charitable quality of the facility. Commercial ventures that charge market rates for their services sometime operate at a loss despite their for-profit status. Moreover, to the extent "'charity'" implies a gifting of resources (*Stockton, supra*, 66 Cal.2d at p. 19), the court could have found that evidence of a gift was lacking.

We conclude the trial court could have reasonably found that THM did not meet its burden of demonstrating House Fitness has a charitable purpose. The character and weight of the evidence did not foreclose a finding by the court that THM did not meet its burden of proof to demonstrate House Fitness was entitled to a welfare exemption based

on exclusive use for a charitable purpose.[8]  The evidence does not compel a result contrary to the judgment.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to its costs on appeal.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.

---

[8]     Because we have determined the trial court could have reasonably rejected the claim that House Fitness served a charitable purpose, we need not reach the question of whether House Fitness was used exclusively or primarily for that purpose.